

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-16-2002

# Lepages Inc v. MN Mining Mfg Co

Precedential or Non-Precedential:

Docket 0-1368

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Lepages Inc v. MN Mining Mfg Co" (2002). *2002 Decisions.* Paper 20.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/20

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Volume 1 of 2

Filed January 14, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 00-1368 and 00-1473

LEPAGE'S INCORPORATED;
LEPAGE'S MANAGEMENT COMPANY, LLC,

       Appellees/Cross-Appellants

v.

3M (MINNESOTA MINING AND MANUFACTURING
COMPANY); KROLL ASSOCIATES, INC.

Minnesota Mining and Manufacturing Company,

       Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 97-03983)
District Judge: The Honorable John R. Padova

Argued July 12, 2001

BEFORE: SLOVITER, ALITO, and GREENBERG,
Circuit Judges

(Filed: January 14, 2002)

Barbara W. Mather (argued)
Jeremy Heep
Pepper Hamilton LLP
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA 19103-2799

Peter Hearn
Peter Hearn, P.C.
519 Pine Street
Philadelphia, PA 19106

Mark W. Ryan
Kerry Lynn Edwards
Donald M. Falk
Robert L. Bronston
David A.J. Goldfine
Mayer, Brown & Platt
1909 K Street, N.W.
Washington, D.C. 20006-1101

 Attorneys for Appellees/
Cross-Appellants

M. Laurence Popofsky
Stephen V. Bomse (argued)
Paul Alexander
Marie L. Fiala
Heller Ehrman White & McAuliffe
333 Bush Street
San Francisco, CA 94104

John G. Harkins, Jr.
Harkins Cunningham
2800 One Commerce Square
2005 Market Street
Philadelphia, PA 19103

 Attorneys for Appellant/
Cross-Appellee

2

OPINION OF THE COURT

GREENBERG, Circuit Judge.

This matter comes on before the court on defendant 3M's
(Minnesota Mining and Manufacturing Company) appeal
from an order of the district court entered March 14, 2000,
partially granting and partially denying its motion for
judgment as a matter of law and denying 3M's motion for
a new trial and on plaintiff LePage's Incorporated's cross-
appeal from the order partially granting 3M's motion for
judgment as a matter of law.1 LePage's brought this
antitrust action asserting that 3M used its monopoly over
its "Scotch" tape brand to gain a competitive advantage in
the private label tape portion of the transparent tape
market in the United States through the use of 3M's multi-
tiered "bundled rebate" structure, which offered higher
rebates when customers purchased products in a number
of 3M's different product lines. LePage's also alleged that
3M offered some LePage's customers large lump-sum cash
payments, promotional allowances and other cash
incentives to encourage them to enter into exclusive dealing
arrangements with 3M.

After the jury found in 3M's favor on LePage's's claims for
unlawful agreements in restraint of trade and exclusive
dealing but against 3M on LePage's's monopolization and
attempted monopolization claims, 3M filed its motions for
judgment as a matter of law and for a new trial, arguing
that its rebate and discount programs and its other alleged
conduct of which LePage's complained did not constitute
the basis for a valid antitrust claim as a matter of law and
that, in any event, the court's charge to the jury was
insufficiently specific and LePage's's damages proof was
speculative.2 The district court granted 3M's motion for

_____

1. The plaintiffs in this action are LePage's Incorporated and LePage's
Management Company, LLC, and both are appellees and cross-
appellants. Inasmuch as we can discern no distinction between their
interests, we refer to them simply as LePage's singularly.

2. 3M unsuccessfully had moved for a judgment as a matter of law at the
close of LePage's's case and after the close of the entire case.

judgment as a matter of law on LePage's's "attempted maintenance of monopoly power" claim but denied 3M's motion for judgment as a matter of law in all other respects and denied its motion for new trial. See LePage's Inc. v. 3M, No. Civ. A. 97-3986, 2000 WL 280350 (E.D. Pa. Mar. 14, 2000). The court subsequently entered a judgment for trebled damages of $68,486,679 to which interest was to be added, and this appeal and cross-appeal then followed.

We will affirm the district court's order granting the motion for judgment as a matter of law with respect to the "attempted maintenance of monopoly" claim but will reverse the district court's order denying the motion for judgment as a matter of law in all other respects. Thus, we will remand the case to the district court to enter judgment in favor of 3M.

I. BACKGROUND

A. FACTUAL BACKGROUND

3M, founded in 1902, introduced transparent tape for home and office use over 70 years ago. The readers of this opinion no doubt will recognize that 3M's Scotch products have become a familiar brand, and, in fact, 3M dominated the United States transparent tape market with a market share above 90% until the early 1990s. LePage's, founded in 1876, has sold a variety of office products and, around 1980, decided to sell "second brand" and private label tape, i.e., tape sold under the retailer's, rather than the manufacturer's name. This endeavor was successful to the extent that LePage's captured 88% of private label tape sales in the United States by 1992. Moreover, changing distribution patterns and consumer acceptance of "second brand" and private label tape accounted for a shift of some tape sales from branded tape to private label tape. These changes were attributable to the rapid growth of office superstores such as Staples and Office Depot and mass merchandisers such as Wal-Mart and Kmart, as many of these retailers wanted to use their "brand names" to sell stationery products including transparent tape. Not surprisingly, during the early 1990s, 3M also entered the private label business.

LePage's claims that, in response to the growth of this competitive market, 3M engaged in a series of related, anticompetitive acts aimed at restricting the availability of lower-priced transparent tape to consumers. It also claims that 3M devised programs that prevented LePage's and the other domestic company in the business, Tesa Tuck, Inc., from gaining or maintaining large volume sales and that 3M maintained its monopoly by stifling growth of private label tape and by coordinating efforts aimed at large distributors to keep retail prices for Scotch tape high.3 LePage's claims that it barely was surviving at the time of trial and that it suffered large operating losses from 1996 through 1999.

1. Rebate program

This case centers on 3M's programs that, beginning in 1993, involved offers by 3M of "package" or "bundled" discounts for various items ranging from home care and leisure products to audio/visual and stationery products. Customers could earn rebates by purchasing, in addition to transparent tape, a variety of products within 3M's stationery division, such as Post-It Notes and packaging products. These programs created incentives for retailers to purchase more 3M products and enabled customers to have single invoices, single shipments and uniform pricing programs for various products in its consumer products division. The size of the rebate, however, was linked to the number of product lines in which the customers met the targets, an aggregate number that determined the rebate percentage the customer was to receive on all of its 3M purchases across all product lines. Therefore, if customers failed to meet growth targets in multiple categories, they received no rebate, and if they failed to meet the target in one product line, 3M reduced their rebates substantially. These requirements are at the crux of the controversy here, as LePage's claims that customers could not meet these growth targets without eliminating LePage's as a supplier.

In practice, 3M's rebate program evolved so that it offered three different types of rebates: Executive Growth Fund,

_____

3. It appears that at least at the times material to this action, there were no other domestic manufacturers of transparent tape. There were, however, foreign manufacturers.

5

Partnership Growth Fund and Brand Mix Rebates. 3M developed a "test program" called Executive Growth Fund ("EGF ") for a small number of retailers, 11 in 1993 and 15 in 1994. Under EGF, 3M negotiated volume and growth targets for each customer's purchases from the six 3M consumer product divisions involved in the EGF program. A customer meeting the target in three or more divisions earned a volume rebate of between 0.2–1.25% of total sales.

Beginning in 1995, 3M undertook to end the EGF test program and institute a rebate program called Partnership Growth Fund ("PGF ") for the same six 3M consumer products divisions. Under this program, 3M established uniform growth targets applicable to all participants. Customers who increased their purchases from at least two divisions by $1.00 and increased their total purchases by at least 12% over the previous year qualified for the rebate, which ranged from 0.5% to 2%, depending on the number of divisions (between two to five divisions) in which the customer increased its purchases and the total volume of purchases. Under both the EGF and PGF programs, customers could use their rebates as they saw fit.

In 1996 and 1997, 3M offered price incentives called Brand Mix Rebates to two tape customers, Office Depot and Staples, to increase purchases of Scotch brand tapes. 3M imposed a minimum purchase level for tape set at the level of Office Depot's and Staples's purchases the previous year with "growth" factored in. To obtain a higher rebate, these two customers could increase their percentage of Scotch purchases relative to certain lower-priced orders.

2. The Major Customers

The evidence at trial focused on the parties' actual experience with a limited number of customers which we thus discuss at length.

Wal-Mart

Before 1992, Wal-Mart bought private label tape only from LePage's but, in August 1992, decided to buy private label tape from 3M as well. In response, LePage's lowered its prices and increased its sales to Wal-Mart. In 1997, Wal-Mart stopped buying private label tape but offered

LePage's's branded tape as its "second tier" offering. In 1998, however, Wal-Mart told LePage's that it was going to switch to a tape program from 3M. LePage's's president then visited Wal-Mart following which Wal-Mart changed its plans and retained LePage's as a supplier. Afterwards, Wal-Mart designed a test comparing LePage's's brand against a 3M Scotch utility tape to determine who would win Wal-Mart's "second tier" tape business. LePage's added more inches (approximately 20% more) to its rolls of tape and won the test. 3M continued, however, to sell other Scotch brand tapes to Wal-Mart, and LePage's saw its sales to Wal-Mart decline to approximately $2,000,000 annually by the time of trial. LePage's claims that Wal-Mart cut back on its tape purchases to qualify for 3M's bundled rebate of $1,468,835 in 1995.

Kmart

Kmart accounted for 10% of LePage's's annual tape sales when LePage's lost its business to 3M in 1993. Kmart asked its suppliers, including 3M, to provide a single bid on its entire private label tape business for the following year. LePage's's president believed, however, that Kmart was "too lazy to make a change," and that it would "never put their eggs in one basket" by giving all the business to 3M. LePage's offered the same price it had offered the previous year but also offered a volume rebate. 3M offered a lower price and won the bid. Kmart asked for rebates and "market development" funds as part of the private label tape bid process. 3M offered $200,000 for promotional activities and a $300,000 volume rebate if Kmart purchased $10,000,000 of 3M's Stationery Division products.

LePage's claims that 3M offered Kmart $1,000,000 to eliminate LePage's and Tesa as suppliers and to make 3M its sole tape supplier. LePage's points to a 3M document outlining 3M's goal for Kmart to exceed $15,000,000 in 3M purchases with the reward being that Kmart would receive $75,000 in each of the first two quarters and $100,000 in the last two quarters for promotional activities and would receive $650,000 as a volume rebate if the sales exceeded $15,000,000. If the sales were less, the rebate would be decreased accordingly, e.g., a $400,000 rebate for $13,000,000 of sales. LePage's claims that, as a practical

7

matter, Kmart had to eliminate LePage's and Tesa to reach the growth 3M required in order to qualify for the rebate. LePage's asserts that, despite its efforts to regain the private label business from Kmart, one Kmart buyer told it that he could not talk to LePage's about tape products for the next three years. See Br. of Appellee at 9.

Staples

Staples had been a LePage's customer for several years. From 1990 to 1993, LePage's increased its sales to Staples by 440%, growing from $357,000 to $1,954,000. In 1994, Staples considered reducing suppliers and asked LePage's and 3M for their best offers in 1994. LePage's assumed that if 3M did make a good offer, LePage's would have a chance to make a better proposal. LePage's did not make its lowest offer, and 3M won the account. When LePage's went back to Staples with a new price, it was told that the decision had been made. LePage's claims that 3M offered an extra 1% bonus rebate on Scotch products if Staples eliminated LePage's as a supplier (a "growth" rebate that only could be met by converting all of LePage's's private label business to 3M). 3M paid Staples an advertising allowance in four payments totalling $1,000,000 in 1995 and gave it $500,000 in free merchandise delivered during Staples's fiscal year 1994. 3M refers to a "$1.5 million settlement" with Staples and refers to multiple payments for different purposes. LePage's, however, implies that these payments bore some connection to Staples's award of its second-tier tape business to 3M. Br. of Appellee at 10.

Office Max

In 1998, after a dispute between Office Max and LePage's, Office Max accepted 3M's offer that matched but did not beat LePage's's price. LePage's objected to 3M's matching whatever price LePage's offered, and also objected to 3M's "clout" payment. Office Max required its suppliers to make payments to help advertise the Office Max name, and LePage's had paid this "clout" payment in the years previous to 1998 when it refused to pay it because of its dispute with Office Max. Nevertheless, the buyer for Office Max testified that its decision to give its business to 3M was not related to its pricing and rebate program but rather to the consistency of its service.

8

Walgreens

Walgreens had purchased private label tape from
LePage's from 1992 until 1998, when it decided to import
tape from Taiwan. LePage's's chief executive officer
acknowledged that LePage's did not lose the account due to
3M's activities.

American Stores

Until 1995, LePage's's sales of private label tape to
American Stores exceeded $1,000,000 annually. According
to LePage's, a month after American Stores decided that it
would try to maximize 3M's PGF rebate, it shifted its tape
business to 3M. In 1995, American Stores decided to stop
buying LePage's tape, principally because of quality
concerns. In a letter to James Kowieski, Senior Vice
President of Sales at LePage's, Kevin Winsauer, the
manager of the private label department at American,
wrote: "After much deliberation comparing the pros and
cons of LePage's program and 3M's program, I have decided
to award the business to 3M. 3M's proposal was very
competitive and I am sure LePage's would meet their costs
to retain the business. However, the decision to move to 3M
is primarily based on Quality." SJA 2050-51 (emphasis in
original). When American Stores decided to purchase from
3M, it was not participating in any rebate programs, and
Winsauer testified that he was not aware that there were
rebate programs. He also testified that even without the
volume incentive programs, 3M's price was still slightly
lower than LePage's's.

Dollar General, CVS, and Sam's Club

LePage's lost Dollar General's private label business to a
foreign supplier but later won the business back. According
to LePage's's president, Dollar General used the bid for
import tape to leverage a price reduction from LePage's. 3M
bid on the CVS account, but LePage's retained CVS as a
customer by lowering its prices and increasing its rebate. At
Sam's Club, LePage's tape had been selling well when its
buyers were directed by senior management to "maximize"
all purchases from 3M to maximize the EGF/PGF rebate.
Subsequently, Sam's Club stopped purchasing from
LePage's.

9

Other distributors and buying groups

LePage's claimed that 3M's pricing practices prevented or hindered it from selling private label tape to certain companies:

(1) Costco. Costco, however, never has sold private label tape. (2) Office Depot. Office Depot also never has sold private label tape. LePage's tried to convince Office Depot to buy private label tape in 1991 or 1992 (before 3M implemented the rebate programs), but Office Depot decided to continue purchasing 3M brand tape. (3) Pamida and Venture Stores. LePage's claimed that 3M offered these stores discounts conditioned on exclusivity, thereby preventing LePage's from selling private label tape to them. LePage's lost Venture Stores' business in 1989, five years before 3M provided the discount at issue. (4) Office Buying Groups. 3M offered an optional 0.3% price discount to National Office Buyers ("NOB") and UDI if they exclusively promoted certain 3M products in their catalogs. If the buying group carried a lower value brand alternative to 3M's main brand (its second line), then the group would receive a lower annual volume rebate. LePage's viewed these kind of contract provisions as a "penalty" that coerced buying group members to purchase tape only from 3M. For example, if a buying group promoted the products of a competitor, it lost rebates for purchases in three categories of products. See Br. of Appellee at 20. 3M argues that LePage's could have offered its own discount or rebate but instead refused to pay the standard promotional fee that UDI charged suppliers for inclusion in its catalog.

B. PROCEDURAL BACKGROUND

LePage's began this action on June 11, 1997, alleging that 3M had engaged in predatory pricing,[4] tying, full-line forcing, monopoly leveraging, and exclusive dealing in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. SS 1, 2, and/or section 3 of the Clayton Act, 15 U.S.C. S 14.

_____

4. LePage's in its original complaint alleged on information and belief that 3M's "bundled rebates, promotional allowances and other cash incentives across its home and office product line .. . in the aggregate lower the . . . net price for 3M's tape below 3M's cost."

After 3M filed a motion to dismiss, LePage's dropped its allegations of full-line forcing and tying because the necessary element of coercion was not present. LePage's filed two amended complaints and ultimately alleged that 3M:

> (1) began targeting LePage's['s] customers with private-label tape programs in order to deprive LePage's of sales revenue, efficient volume distribution, and transactional efficiency (2) sought to drive LePage's from the [m]arket through use of `bundled rebates' (3) offered a multi-tiered rebate to its customers across its product line . . . thereby forcing customers to give up buying from LePage's; and (4) offered some of LePage's['s] largest customers large lump-sum cash payments, promotional allowances, inventory repurchase, and other cash incentives to encourage them to enter into an exclusive dealing arrangement with 3M.

Br. of Appellant at 3-4.

3M moved for summary judgment after discovery, claiming that its conduct was permissible as a matter of law. In this regard, 3M argued that its rebates were in effect an element of pricing and that its prices were above its costs. Thus, it contended that LePage's's case failed for in Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 222, 113 S.Ct. 2578, 2587 (1993), the Court indicated that "a plaintiff seeking to establish competitive injury from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs." Id., 113 S.Ct. at 2587. Of course, 3M adheres to the same fundamental point on this appeal as it emphasizes that LePage's disavows any contention that 3M's prices were predatory or below costs and that"[a]bove-costs pricing cannot give rise to an antitrust offense as a matter of law" inasmuch as in Brooke Group the Court held "that it is not unlawful to lower one's prices so long as they remain above cost." Br. of Appellant at 30, 36.

Notwithstanding its original allegations to the contrary, LePage's answered that it did not claim in this case that 3M engaged in predatory pricing and that it could satisfy the

legal standards reflected in SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056 (3d Cir. 1978), so as to justify this action. The district court denied 3M's motion for summary judgment based on the court's view that LePage's might be able to prove a SmithKline intra-market monopoly leveraging claim depending on the structure of the program and the role of 3M's monopoly power in it. See LePage's Inc. v. 3M, No. Civ. A 97-3983, 1999 WL 346223, at *7 (E.D. Pa. May 14, 1999).

The case was tried before a jury on the following claims: exclusive dealing and unreasonable restraint of trade under section 1 of the Sherman Act and section 3 of the Clayton Act and monopolization and attempted maintenance of monopoly power under section 2 of the Sherman Act. After a lengthy trial, the jury unanimously found for 3M on LePage's's claims for unlawful agreements in restraint of trade and exclusive dealing and for LePage's on its monopolization and attempted monopolization claims. The jury awarded LePage's damages of $22,828,899, which the court later trebled to $68,486,697 when it entered the judgment on April 6, 2000.

On November 24, 1999, 3M moved for judgment as a matter of law and for a new trial. 3M argued that its rebate and discount programs and other allegedly predatory conduct did not give rise to a valid antitrust claim as a matter of law, that the jury charge was insufficiently specific, and that LePage's's damage proof was speculative and failed to relate damages to specific unlawful conduct. As we have indicated, the district court granted 3M's motion for judgment as a matter of law on the "attempted maintenance of monopoly power" claim but denied 3M's motion for judgment as a matter of law in all other respects and denied its motion for a new trial. See LePage's, 2000 WL 280350, at *12-13.

3M filed a timely notice of appeal on April 25, 2000, and LePage's filed a timely notice of cross-appeal on its "attempted maintenance of monopoly power" claim on May 5, 2000. LePage's has not appealed the jury's verdict that 3M did not engage in exclusive dealing or otherwise violate section 1 of the Sherman Act or section 3 of the Clayton Act, and thus those claims no longer are directly in issue in

12

the case. Therefore, this appeal and cross-appeal concern only whether 3M violated section 2 of the Sherman Act by unlawfully maintaining a monopoly in the United States market for home and office transparent tape and for unlawful attempted maintenance of monopoly power in that market.

## II. DISCUSSION

### A. JURISDICTION

The district court had jurisdiction over this case pursuant to 28 U.S.C. SS 1331 and 1337(a) because LePage's brought these claims under the Sherman and Clayton Acts. We have jurisdiction over this appeal pursuant to 28 U.S.C. S 1291.

### B. STANDARD OF REVIEW

We exercise plenary review over an order granting or denying a motion for judgment as a matter of law. See Shade v. Great Lakes Dredge & Dock Co., 154 F.3d 143, 149 (3d Cir. 1998). When, as here, a defendant makes such a motion, a court should grant it "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993). Thus, we review the evidence on the appeal in a light most favorable to LePage's and on the cross-appeal in a light most favorable to 3M. We note, however, that our opinion largely turns on legal determinations and the historical facts are not in sharp dispute. We review questions of law underlying the jury verdict on a plenary basis as well. See Bloom v. Consolidated Rail Corp., 41 F.3d 911, 913 (3d Cir. 1994). While the parties tender issues on this appeal relating to the review of an order denying a new trial and with respect to damages, we do not set forth a standard of review on these issues as we do not reach them.

13

C. MONOPOLIZATION CLAIM

We will reverse the denial of 3M's motion for judgment as a matter of law on the monopolization claim. LePage's argues that 3M willfully maintained its monopoly through a "monopoly broth" of anticompetitive and predatory conduct. LePage's relies heavily on our opinion in SmithKline for its argument that a court can find that a company willfully has acquired and maintained monopoly power if it links a product on which it does not face competition with a product on which it faces competition. We conclude, however, that this case is distinguishable from SmithKline, which thus is not controlling. Rather, we agree with 3M that LePage's simply did not establish that 3M's conduct was illegal, as LePage's did not demonstrate that 3M's pricing was below cost and, in the absence of such proof, the record does not supply a basis on which we can uphold the judgment.

There are two elements of a monopolization claim under section 2 of the Sherman Act: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704 (1966). Willful maintenance involves using anticompetitive conduct to "foreclose competition, to gain a competitive advantage, or to destroy a competitor." Eastman Kodak Co. v. Image Technical Servs., 504 U.S. 451, 482–83, 112 S.Ct. 2072, 2090 (1992) (internal quotation marks omitted). LePage's contends that 3M's bundled rebates were anticompetitive and predatory. It also argues that 3M's other practices, such as exclusionary contracts and the timing of its rebates, were also anticompetitive and predatory.

1. Bundled Rebates

LePage's primarily complains of 3M's use of bundled rebates. While we have held that rebates on volume purchases are lawful, see Advo, Inc. v. Philadelphia Newspapers, Inc., 51 F.3d 1191, 1203 (3d Cir. 1995), LePage's seeks to avoid that principle by pointing out that

14

3M offered higher rebates if customers met their target growth rate in different product categories, in effect linking the sale of private label tape with the sale of other products, such as Scotch tape, which customers had to buy from 3M. Thus, LePage's explains:

> 3M understood that, as a practical matter, every retailer in the country had to carry Scotch-brand tape . . . . It therefore decided to structure its rebates into bundles that linked that product with the product segment in which it did face competition from LePage's (second-line tape) . . . . To increase the leverage on the targeted segment, 3M further linked rebates on transparent tape with those for many other products . . . . The rival would have to `compensate' the customer for the amount of rebate it would lose not only on the large volume of Scotch-brand tape it had to buy, but also for rebates on many other products purchased from 3M.5

Br. of Appellee at 40.

As we have suggested, the principal case on which LePage's relies for support for its argument is SmithKline.

_____

5. While LePage's does not label this argument "monopoly leveraging" and argued against the jury being instructed on the elements of a monopoly leveraging case (claiming that this is an "old fashioned monopoly case"), it is undeniable that the claim is similar to that advanced in the SmithKline, which has been labeled a monopoly leveraging case. See Advo, 51 F.3d at 1203; Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 204 (3d Cir. 1992). In a monopoly leveraging case, however, there are two markets—one in which the company enjoys a monopoly and another in which it tries to leverage the former monopoly power. ERNEST GELLHORN & WILLIAM E. KOVACIC, ANTITRUST LAW AND ECONOMICS 152 (4th ed. 1994). In this case and in SmithKline, there was only one market (the transparent tape market in this case and the cephalosporin market in SmithKline). Consequently, our prior characterization of SmithKline may be problematical. LePage's's reference to customers' "inelastic" need for Scotch tape, see Br. of Appellee at 28, and its contention that, as a practical matter, stores had no choice but to carry Scotch tape, see id. at 40, does suggest that there may be either two separate markets or one market and one submarket. We do not address this point, however, because the parties treat this case as having only one market for the purposes of this appeal.
Even if this were considered a monopoly leveraging case, however, then Fineman would control, and LePage's would not have established the

In that case, Eli Lilly & Co. had two products, Keflin and Keflex, on which it faced no competition, and one product, Kefzol, on which it faced competition from SmithKline's product, Ancef. See SmithKline, 575 F.2d at 1061. Lilly offered a higher rebate of 3% to companies that purchased specified quantities of any three (which, practically speaking, meant combined purchases of Kefzol, Keflin and Keflex) of Lilly's cephalosporin products. See id. "Although hospitals were free to purchase SmithKline's Ancef with their Keflin and Keflex orders with Lilly, thus avoiding the penalties of a tie-in sale,6 the practical effect of that

_____

requirements for 3M to be liable. See Fineman , 980 F.2d at 204. LePage's does not show that 3M had an actual or threatened monopoly in the leveraged market (private label tape). At the time of trial, LePage's still
had 67% of the private label market, down from 88% previously. See Br. of Appellant at 8.

Fineman involved a producer of a videotape magazine to be sold via distributors to retailers of floor covering products, which (with its principal) brought action against the floor covering manufacturer, alleging, inter alia, antitrust violations such as monopoly leveraging under the Sherman Act. See Fineman, 980 F.2d at 171. In Fineman, we declined to follow Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 275 (2d Cir. 1979), which involved a plaintiff that alleged that Kodak had leveraged its monopoly power in the camera and film markets to obtain a "competitive advantage" in the photofinishing equipment and services markets. In Berkey Photo the court held that the use of monopoly power attained in one market to gain a competitive advantage in another is a violation of section 2, even if there has not been an attempt to monopolize the second market. See id.  at 276. Noting that only the Court of Appeals for the Sixth Circuit has adopted the Berkey Photo reasoning, in Fineman we agreed that in order to prevail upon a theory of monopoly leveraging, a plaintiff must prove threatened or actual monopoly in the leveraged market. See Fineman, 980 F.2d at 205. That circumstance does not apply here.

6. 3M also avoids the penalties of a tie-in sale, because its customers were free to purchase its Scotch tape by itself. To prove an illegal tie-in,
a plaintiff must establish that the agreement to sell one product was conditioned on the purchase of a different or tied product; the seller "has
sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a `not insubstantial' amount of interstate commerce is affected." Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 6, 78 S.Ct. 514, 518 (1958).

16

decision would be to deny the Ancef purchaser the 3%
bonus rebate on all its cephalosporin products." Id.
(internal footnote added). Because of Lilly's volume
advantage, to offer a rebate of the same net dollar amount
as Lilly's, SmithKline would have had to offer companies
rebates ranging from 16% for average size hospitals to 35%
for larger volume hospitals for their purchase of Ancef. See
id.

We concluded that Lilly willfully acquired and maintained
monopoly power by linking products on which Lilly faced no
competition (Keflin and Keflex) with a competitive product,
resulting in the sale of all three products on a non-
competitive basis in what otherwise would have been a
competitive market between Ancef and Kefzol. See id. at
1065. Moreover, this arrangement would force SmithKline
to pay rebates on one product equal to rebates paid by Lilly
based on sales volume of three products. See id. Expert
testimony and the evidence on pricing showed that in the
circumstances SmithKline's prospects for continuing in the
Ancef market were poor.

Here, LePage's argues that it does not have to show that
3M's package discounts could prevent an equally efficient
firm from matching or beating 3M's package discounts. In
its brief, LePage's argues that its expert economist
explained that 3M's programs and cash payments have the
same anticompetitive impact regardless of the cost
structure of the rival suppliers or their efficiency relative to
that of 3M. See Br. of Appellee at 43. LePage's alleges that
the relative efficiency or cost structure of the competitor
simply affects how long it would take 3M to foreclose the
rival from obtaining the volume of business necessary to
survive. See id. at 43. "Competition is harmed just the
same by the loss of the only existing competitive
constraints on 3M in a market with high entry barriers." Id.
The district court stated that LePage's introduced
substantial evidence that the anticompetitive effects of 3M's
rebate program caused its losses. See LePage's , 2000 WL
280350, at *7-8.

We disagree with LePage's and the district court. In
SmithKline, it was important that SmithKline showed that
it could not compete by explaining how much it would have

17

had to lower prices for both small and big customers to do so. SmithKline ascertained the rebates that Lilly was giving to customers on all three products and calculated how much it would have had to lower the price of its product if the rebates were all attributed to the one competitive product. In contrast, LePage's did not even attempt to show that it could not compete by calculating the discount that it would have had to provide in order to match the discounts offered by 3M through its bundled rebates, and thus its brief does not point to evidence along such lines. It also did not show the amount by which it lowered its prices in actual monetary figures or by percentage to compete with 3M and how its profitability thus was decreased, and once again, its brief does not point to evidence along such lines. Rather, LePage's merely maintains, through the use of an expert, that it would have had to cut its prices drastically to compete and thus would have gone out of business.

Although we are not evaluating the expert's method of calculating damages,[7] and indeed, we do not reach the damages issue, we cannot overlook the lack of evidence to prove that pricing was what caused the drop in LePage's's market share. Simply pointing to an expert to support the contention that the company would have gone out of business, without providing even the most basic pricing information, is insufficient. "Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute

_____

7. We note that LePage's has pointed out that case law supports its expert's use of the but-for model of calculating damages. See Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 117 n.11, 89 S. Ct. 1562, 1573 n.11 (1969); Rossi v. Standard Roofing, Inc., 156 F.3d 452, 484-87 (3d Cir. 1998). In Bonjorno v. Kaiser Aluminum & Chem. Corp., 752 F.2d 802, 812 (3d Cir. 1984), we stated that in constructing a hypothetical world free of defendants' exclusionary conduct, the plaintiffs are given some latitude in calculating damages, as long as their
theory is not "wholly speculative." There we ruled that the implications of the expert's testimony were not so inconsistent with the plaintiffs' theory of liability as to warrant a new trial. See id. at 812. We also stated
that once a jury has found that the unlawful activity caused the antitrust injury, the damages may be determined without strict proof of what act caused which injury, as long as the damages are not based on speculation or guesswork. See id. at 813.

for them." Brooke Group, 509 U.S. at 242, 113 S.Ct. at 2598; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 594 n.19, 106 S.Ct. 1348, 1360 n.19 (1986); Advo, 51 F.3d at 1198-99; Virgin Atlantic Airways Ltd. v. British Airways PLC, 69 F. Supp.2d 571, 579 (S.D.N.Y. 1999) ("[A]n expert's opinion is not a substitute for a plaintiff 's obligation to provide evidence of facts that support the applicability of the expert's opinion to the case."), aff 'd, 257 F.3d 256 (2d Cir. 2001). Without such pricing information, it is difficult even to begin to estimate how much of the market share LePage's lost was due to 3M's bundled rebates. Furthermore, some experts have questioned the validity of attributing all the rebates to the one competitive product in situations such as these. 8 We do not need, however, to decide the validity of that method of

_____

8. One court has mentioned a hypothetical situation where a low-cost shampoo maker could not match a competitor's package discount for shampoo and conditioner even though both products were priced above their respective costs. See Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc., 920 F. Supp. 455, 467 (S.D.N.Y. 1996). In that case, the court suggested that the bundled price could be unlawful under section 2 even though neither item in the package was priced below cost. If the entire package discount were attributed to the one product where the two parties compete, the low-cost shampoo maker could not lower its prices on the product enough to match the total discount without selling below its cost. See id. at 467-69. The Areeda treatise, however, suggests that this analysis is incorrect. See III PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATI ON P 749, at 467 n.6 (rev. ed. 1996).

One aspect of this method of calculation worth noting is that the volume of the products ordered has a drastic effect on how much the competitor would have to lower its prices to compete. For example, suppose in a similar rebate program, a company was the only producer of products A and B but faced competition in C. If a customer orders 100 units each of A, B, and C at a price of $1.00 each, a 3% rebate would be $9.00 (3% of the total of $300.00). If the rebate on all three products were attributed to product C, then the competitor would have to lower its price to $0.91 in order to compete with it. The results would be starkly different, however, if a customer orders 100 units of A and B but only needs 10 units of C. Then the 3% rebate on the total purchase amount of $210.00 would be $6.30. If the rebate was attributed solely to product C, then a competitor would have to lower its price to $.37 on product C in order to match the company's price.

calculation, as LePage's does not even attempt to meet that less strict test by calculating how much it would have had to lower its prices to match the rebates, even if they all were aggregated and attributed to private label tape.9

LePage's also has not satisfied the stricter tests devised by other courts considering bundled rebates in situations such as that here. In a case brought by a manufacturer of products used in screening blood supply for viruses, Ortho Diagnostic Systems, Inc. v. Abbot Laboratories, Inc. , 920 F. Supp. 455 (S.D.N.Y. 1996), the district court held, inter alia, that the defendant's discount pricing of products in packages did not violate the Sherman Act. The defendant, Abbott Laboratories, manufactured all five of the commonly used tests to screen the blood supply for viruses. Ortho claimed that Abbott violated sections 1 and 2 of the Sherman Act by contracting with the Council of Community Blood Centers to give those members advantageous pricing if they purchased a package of four or five tests from Abbott, thereby using its monopoly position in some of the tests to foreclose or impair competition by Ortho in the sale of those tests available from both companies. See id. at 458. The district court stated that to prevail on a monopolization claim in "a case in which a monopolist (1) faces competition on only part of a complementary group of products, (2) offers the products both as a package and individually, and (3) effectively forces its competitors to absorb the differential between the bundled and unbundled prices of the product in which the monopolist has market power," the plaintiff must allege and prove "either that (a) the monopolist has priced below its average variable cost or (b) the plaintiff is at least as efficient a producer of the competitive product as the defendant, but that the defendant's pricing makes it unprofitable for the plaintiff to continue to produce." Id. at 469.

Holding that the discount package pricing did not violate

_____

9. The closest LePage's comes to supplying such information in its brief is its statement that "LePage's made repeated efforts to save its tape business with Staples, reducing its prices to 1990 levels, and then reducing them again, to keep its plant open and people working." Br. of Appellee at 11. This is not close enough.

20

the Sherman Act, the Ortho court explained that any other rule would involve too substantial a risk that the antitrust laws would be used to protect an inefficient competitor against price competition that would benefit consumers. See id. at 470 ("The antitrust laws were not intended, and may not be used, to require businesses to price their products at unreasonably high prices (which penalize the consumer) so that less efficient competitors can stay in business.") (internal quotation marks omitted).

In this case, LePage's now does not contend that 3M priced its products below average variable cost, an allegation which, if made, in any event would be difficult to prove. See Advo, 51 F.3d at 1198–99.10 Moreover, LePage's's economist conceded that LePage's is not as efficient a tape producer as 3M. Furthermore, LePage's has not shown through an explanation of the prices it would have had to charge to match 3M's bundled rebates, that it would have been unprofitable for it to continue to produce.

By its failure to show how much it would have to lower its prices before it would be driven out of business, LePage's effectively is arguing that it is the linkage of a monopoly product with a competitive one that is the significant factor to be considered rather than the pricing. Indeed, apparently this is also why LePage's insists that, while certain of 3M's actions were predatory, this is not a predatory pricing case. But if the mere act of offering a

_____

10. 3M argues that Brooke Group provides that lowering the effective price of a product through price incentives cannot give rise to a section 2 Sherman Act claim unless the price is lower than an appropriate measure of cost. In fact, the Court's language in Brooke Group does raise a serious question as to whether or not it limits the holding of SmithKline
to situations where prices are below average variable cost. However, Brooke Group was a predatory pricing or primary–line price discrimination case in which none of the tobacco companies had a monopoly of the market. See Brooke Group, 509 U.S. at 221–22, 113 S.Ct. at 2587. But inasmuch as LePage's does not even present a case that fulfills the requirements to establish liability of SmithKline, we need
not decide the effect of Brooke Group on SmithKline. In the circumstances, we emphasize that we are not holding that if LePage's had supplied pricing information similar to that SmithKline presented our result would be different.

bundled rebate can be condemned under section 2 of the Sherman Act without regard for the relative efficiency or cost structure of the competitor, then competitors unwilling to accept lower profits could use the law to insulate themselves from competition. For example, a competitor who would have to lower its prices by 1% in order to match a bundled rebate could file suit against the alleged monopolist and obtain relief merely because it does not want to accept lower profits. It is difficult to see how consumers are better off if bundled rebates are illegal regardless of how competition is affected. After all, the Sherman Act "directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 458, 113 S.Ct. 884, 892 (1993); see also United States v. Microsoft Corp., 253 F.3d 34, 58 (D.C. Cir.), cert. denied, 122 S.Ct. 350 (2001).

Furthermore, this is not a situation in which there is no business justification for 3M's actions. Inasmuch as it is difficult to distinguish legitimate competition from exclusionary conduct that harms competition, see Microsoft Corp., 253 F.2d at 58, some cases suggest that when a company acts against its economic interests and there is no valid business justification for its actions, then it is a good sign that its acts were intended to eliminate competition.

For example, Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 608, 105 S.Ct. 2847, 2860 (1985), sets forth the lack of a valid business reason as a basis for finding liability. In that case, the Court affirmed a jury verdict for the plaintiff under section 2 of the Sherman Act where the defendant monopolist had stopped cooperating with the plaintiff to offer a multi-venue skiing package for Aspen skiers. The Court held that because the defendant had acted contrary to its economic interests, by losing business and customers, there was no other rationale for its conduct except that it wished to eliminate the plaintiff as a competitor. See id. at 608, 105 S.Ct. at 2860; see also Eastman Kodak, 504 U.S. at 483, 112 S.Ct. at 2090 (exclusionary conduct properly is condemned if valid business reasons do not justify conduct that tends to impair the opportunities of a monopolist's rivals or if a valid

22

asserted purpose would be served fully by less restrictive means).11

Similarly, in Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1043, 1063 (8th Cir.), cert. denied, 531 U.S. 979, 121 S.Ct. 428 (2000), where boat builders brought an antitrust action against a stern drive engine manufacturer, the court held, inter alia, that the evidence was insufficient to find that the engine manufacturer's discount programs restrained trade and monopolized the market. Brunswick offered a higher percentage discount when boat builders bought a higher percentage of their engines from it, but there was no allegation that its pricing was below cost. See id. at 1044, 1062. In Concord Boat the district court cited the district court opinion in this case when 3M filed its motion to dismiss. See LePage's Inc. v. 3M, No. Civ. A. 97–3983, 1997 WL 734005 (E.D. Pa. Nov. 14, 1997). The Concord Boat district court agreed with the plaintiff that it was not the price (above cost or not) that was relevant but the "strings" attached to the price and that the district court here was correct to distinguish Brooke Group since there were no "strings" attached (bundled rebates) in that case. In Concord Boat, the strings attached were the

_____

11. Microsoft also offers some guiding principles on monopolization under section 2. To be condemned as exclusionary, a monopolist's act must have an "anticompetitive effect," which means that it must harm the competitive process and thereby harm consumers. Harm to a competitor will not suffice. Microsoft, 253 F.3d at 58. Competitive conduct is acceptable, but conduct that destroys competition is not. See id. As the burden of proof is on the plaintiff, it must demonstrate that the monopolist's conduct has the requisite anticompetitive effect. See id. at 57–58. If a plaintiff establishes a prima facie case under section 2, then the monopolist may offer a "procompetitive justification" for its conduct (a nonpretextual claim that its conduct is indeed a form of competition on the merits because it involves greater efficiency or enhanced consumer appeal), after which the burden would shift back to the plaintiff to rebut that claim. See id. at 59. And finally, if the monopolist's
procompetitive justification is unrebutted, then the plaintiff must demonstrate that the anticompetitive harm outweighs the procompetitive benefits. See id. Microsoft also indicates that in considering the monopolist's conduct, the focus is on the effect of the conduct rather than on the intent behind it, as intent is only relevant in that it helps a
court understand the likely effect of the conduct. Id.

exclusivity provisions. See Concord Boat Corp. v. Brunswick Corp., 21 F. Supp. 2d 923, 930 (E.D. Ark. 1998).

The Court of Appeals for the Eighth Circuit, however, disagreed with the district court in Concord Boat. The court of appeal's opinion reflected an application of Brooke Group's strong stance favoring vigorous price competition and expressing skepticism of the ability of a court to separate anticompetitive from procompetitive actions when it comes to above-cost strategic pricing. See Concord Boat, 207 F.3d at 1061. More importantly, the court perceived that Brooke Group should be considered even with claims based on pricing with strings. See id. "If a firm has discounted prices to a level that remains above the firm's average variable cost, the plaintiff must overcome a strong presumption of legality by showing other factors indicating that the price charged is anticompetitive." Id., citing Morgan v. Ponder, 892 F.2d 1355, 1360 (8th Cir. 1989) (internal quotation marks omitted). The court stated that a section 2 defendant's proffered business justification is the most important factor in determining whether its challenged conduct is not competition on the merits. See id. at 1062. The court, however, distinguished cases such as SmithKline and Ortho where products were bundled since they involved two markets. See id.

Unlike the situation of the defendant in Aspen , 3M's pricing structure and bundled rebates were not necessarily contrary to its economic interests, as they likely increased its sales. Furthermore, other than the obvious reasons such as increasing bulk sales, market share and customer loyalty, there are several other potential "procompetitive" or valid business reasons for 3M's pricing structure and bundled rebates: efficiency in having single invoices, single shipments and uniform pricing programs for various products. See Br. of Appellant at 7. Moreover, the record demonstrates that, with the biggest customers, 3M's rebates were not eliminating the competitive process, as LePage's still was able to retain some customers through negotiation, and even though it lost other customers, the losses were attributable to their switching to foreign suppliers or changing suppliers because of quality or service without regard to the rebates.

24

In sum, we have concluded as a matter of law after an intensive analysis that 3M did not violate section 2 of the Sherman Act by reason of its bundled rebates. If we held otherwise, notwithstanding the effects of the challenged practices on 3M's competitors, we would risk curtailing price competition and a method of pricing beneficial to customers because the bundled rebates effectively lowered their costs.

2. Other Methods

LePage's also claims that, through a variety of other allegedly anticompetitive actions, 3M prevented LePage's from competing. LePage's asserts that 3M foreclosed competition by directly purchasing sole-supplier status. See Br. of Appellee at 45. There was some dispute as to whether the contracts were conditioned on 3M being the sole supplier, and 3M claims that there are only two customers for which there is any evidence of a sole supplier agreement. It appears that most of 3M's contracts with customers were not conditioned on exclusivity, but practically speaking, some customers dropped LePage's as a supplier to maximize the rebates that 3M was offering. Moreover, United Shoe Machinery Corp. v. United States, 258 U.S. 451, 465, 42 S.Ct. 363, 368 (1922), explained that a contract that does not contain specific agreements not to use the products of a competitor still will come within the Clayton Act as to exclusivity if its practical effect is to prevent such use.

Even assuming, however, that 3M did have exclusive contracts with some of the customers, LePage's has not demonstrated that 3M acted illegally, as one-year exclusive contracts have been held to be reasonable and not unduly restrictive. See Federal Trade Comm'n v. Motion Picture Adver. Serv. Co., 344 U.S. 392, 395-96, 73 S.Ct. 361, 363-64 (1953) (holding that evidence sustained the Commission's finding that the distributor's exclusive screening agreements with theater operators unreasonably restrained competition, but stating that the Commission had found that the term of one-year exclusive contracts had become a standard practice and would not be an undue restraint on competition). See also Advo, 51 F.3d at 1204. In Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320,

327, 81 S.Ct. 623, 627–28 (1961), the Court stated that even if in practical application a contract is found to be an exclusive-dealing arrangement, it does not violate section 3 of the Clayton Act unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected. Using that standard, although LePage's's market share in private label tape has fallen from 88% to 67%, it has not been established that, as a result of the allegedly exclusive contracts, competition was foreclosed in a substantial share of the line of commerce affected. Indeed, in view of LePage's's two-thirds share of the private label business, its attack on exclusivity agreements seems rather attenuated.

There appear to be very few cases supporting liability based on section 2 of the Sherman Act for exclusive dealing, as some cases suggest that if, as is the case here under the jury's findings, there is no liability under section 3 of the Clayton Act, it is more difficult to find liability under the Sherman Act since its scope is more restricted.12 In any event, the record shows only two allegedly exclusive contracts (with the Venture and Pamida stores), and "[b]ecause an exclusive deal affecting a small fraction of a market clearly cannot have the requisite harmful effect upon competition, the requirement of a significant degree of foreclosure serves a useful screening function." Microsoft, 253 F.3d at 69. The Microsoft court explained that although exclusive contracts are commonplace, particularly in the field of distribution, in certain circumstances the use of exclusive contracts may give rise to a section 2 violation even though the contracts foreclose less than the roughly 40 to 50% share usually required to establish a section 1 violation. See id. at 69–70. In this case, it cannot be concluded that the two contracts with Venture and Pamida were responsible for the total drop in LePage's's market share. Furthermore, even if all 3M's contracts were considered exclusive, LePage's's total drop in market share was only 21%, and some of this loss was shown in the

_____

12. It is more common for charges of exclusive dealing to be brought under section 1 of the Sherman Act or the Clayton Act, which the jury found that 3M did not violate. See, e.g ., Barr Labs., Inc. v. Abbott Labs.,
978 F.2d 98, 110 (3d Cir. 1992).

26

record to be due to quality or service consistency concerns rather than to 3M's tactics. Therefore, there was not enough foreclosure of the market to have an anticompetitive effect.

LePage's also claims that by calculating the rebates only once a year, 3M made it more difficult for a purchaser to pass on the savings to its customers, thereby making it harder for companies to switch suppliers and keeping retail prices and margins high. See Br. of Appellee at 39-40. As discussed above, one-year contracts may be considered standard, and even if they make it more unlikely that rebates are passed on in the form of lower retail prices, the discounts could be applied towards lowering retail prices the following year or towards other costs by companies that are factored into the retail prices (such as advertising). In the circumstances, we conclude that this conduct does not qualify as predatory or anticompetitive so as to establish liability under section 2 of the Sherman Act.

LePage's also alleges that 3M entered the retail private label tape portion of the market to destroy the market and thereby increase its sales of branded tape, but the case law does not support liability under section 2 for this type of action. In Brooke Group, 509 U.S. at 215, 113 S.Ct. at 2584, Liggett/Brooke Group alleged that Brown & Williamson Tobacco Corporation ("B&W") sold generic cigarettes in order to decrease losses of sales in its branded cigarettes. B&W sold generic cigarettes at the same list price as Liggett but also offered large volume rebates to certain wholesalers so they would buy their generic cigarettes from B&W. See id. at 216, 113 S.Ct. at 2584. B&W wanted to take a larger part of the generic market from Liggett and drive Liggett to raise prices on generic cigarettes, which B&W would match, thereby encouraging consumers to switch back to branded cigarettes. See id. at 216-17, 113 S.Ct. at 2584. The Court held that because B&W had no reasonable prospect of recouping its predatory losses and could not inflict the injury to competition that antitrust laws prohibit, it did not violate the Robinson–Patman Act or the Sherman Act. See id. at 243, 113 S.Ct. at 2598. In this case, however, 3M did not use below average variable cost pricing (LePage's does not charge

27

predatory pricing) and therefore 3M did not have predatory costs to recoup.

We recognize that LePage's attempts to distinguish Brooke Group on the ground that "3M used other techniques [i.e., techniques other than predatory pricing] to extinguish the private-label category subjecting itself to different legal standards," Br. of Appellee at 55, but we nevertheless reject LePage's's argument on this point. While LePage's does not contend that 3M engaged in predatory pricing, it does contend that the goal of 3M's other conduct was "to extinguish the private-label category, subjecting itself to different legal standards" than those applicable in Brooke Group. See id. Moreover, though 3M denies that it was attempting to eliminate the private label category of transparent tape, the record supports a finding that it had that intent.13 We are satisfied, however, that its efforts to eliminate the private label aspect of the transparent tape market are not unlawful as, "examined without reference to its effects on competitors," it is evident that in view of 3M's dominance in brand tape, that it was rational for it to want the sale of tape to be concentrated in that category of the market. See Stearns Airport Equip. Co. v. FMC Corp., 170 F.3d 518, 523 (5th Cir. 1999).14

Accordingly, we find that 3M's actions in the record, including the bundled rebates and other elements of the "monopoly broth," were not anticompetitive and predatory as to violate section 2 of the Sherman Act.

_____

13. It is not possible from the verdict to know how the jury found on this point, and thus we assume for purposes of this opinion that 3M was trying to eliminate the private label category of the transparent tape market. Therefore, if we concluded, which we do not, that a verdict could be upheld on the basis of that finding, we would order a new trial as the verdict nevertheless might, in fact, have been predicated on other theories that could not be justified.

14. We do not understand why 3M's brief misquotes Stearns at 170 F.3d at 523 by substituting the words "A finding of predatory conduct" in a direct quotation for "a finding of exclusionary conduct." Br. of Appellant at 35 n.23.

28

D. ATTEMPTED MAINTENANCE OF MONOPOLY

We will affirm on LePage's's cross-appeal of the district court's grant of 3M's motion for judgment as a matter of law on the "attempted maintenance of monopoly power" claim, although we believe that the district court erred in its reasoning in reaching its result. Section 2 of the Sherman Act does not create a cause of action for an "attempt to maintain a monopoly." Section 2 of the Sherman Act provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony." 15 U.S.C. S 2. Therefore, there can be claims for an attempt to monopolize and claims for monopolization, which include: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Grinnell Corp., 384 U.S. at 570-71, 86 S.Ct. at 1704; see also Houser v. Fox Theatres Mgmt. Corp., 845 F.2d 1225, 1229 (3d Cir. 1988). But even if we treat its claim as an attempted monopolization claim, LePage's has not presented proofs establishing the elements of such a claim.

It is not clear what LePage's intended when it filed an "attempted maintenance of monopoly power" claim. If LePage's wanted to establish liability for 3M's conduct in maintaining a monopoly, then its claim would be covered by the "willful maintenance" part of the "monopolization" offense and would have been encompassed adequately by the monopolization count on appeal. Because 3M long has had monopoly power,[15] any violation it committed would be actual monopolization as opposed to attempted

_____

15. LePage's repeatedly states throughout its brief that 3M concedes that it enjoys monopoly power with a 90% share of the overall relevant market (the United States transparent tape market). See Br. of Appellee at 3. Monopoly power can be defined as the power to control prices and exclude competition regarding a particular product and within a particular geographic market. See Borough of Lansdale v. Philadelphia Elec. Co., 692 F.2d 307, 311 (3d Cir. 1982).

monopolization inasmuch as attempted monopolization is defined as an unsuccessful attempt to achieve monopolization, see American Tobacco Co. v. United States, 328 U.S. 781, 785, 66 S.Ct. 1125, 1127 (1946), and requires "(1) that the defendant has engaged in predatory or anti-competitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." Spectrum Sports, 506 U.S. at 456, 113 S.Ct. at 890-91; see also Ideal Dairy Farms, Inc. v. John Labatt, Ltd., 90 F.3d 737, 750 (3d Cir. 1996).

The district court construed LePage's's "attempted maintenance of monopoly power" claim as reflecting a third cause of action (besides monopolization and attempted monopolization) but found it inherently illogical. See LePage's, 2000 WL 280350, at *2-3. The court explained that "[a]ny `attempt claim' rests on the underlying theory that the defendant has failed to achieve its goal, which in this case is maintenance of monopoly power. But, if the defendant has failed to achieve its goal of maintaining monopoly power, then it follows that the defendant lacks monopoly power. Lacking any monopoly power to maintain, the defendant cannot be held liable for `attempted maintenance of monopoly power.' " Id. at *2. We believe, however, that the district court erred in its reasoning that if a party failed in its goal to maintain monopoly power, then it lacked monopoly power and therefore could not have any monopoly power to maintain. After all, a company could have a legal monopoly and attempt to maintain that monopoly through anticompetitive acts but fail and no longer have a monopoly. It then would have attempted to maintain its monopoly but would not have succeeded in its attempt. This does not mean, however, that it lacked monopoly power and therefore could not have any monopoly power to maintain.

The district court concluded that this "attempted maintenance" concept was actually a standard attempted monopolization claim -- that the defendant does not have monopoly power but eventually would achieve monopoly power if it continued to engage in predatory conduct. Id. at *2-3. LePage's also argues on this appeal that the attempt to maintain a monopoly should fall under the "attempted

30

monopolization" offense and points to cases to support its point of view. Therefore, LePage's opposes the view that because 3M long has had a monopoly, its actions would fall under monopolization rather than attempted monopolization. It argues that a company can succeed in possessing a monopoly and still be held liable for "attempted monopolization."16 In Lorain Journal Co. v.

_____

16. However, it seems to make more sense that in an attempt case the party did not succeed in achieving the monopoly. Indeed, early statements on attempts to monopolize characterize it as "conduct that closely approaches but does not quite attain completed monopolization, plus a wrongful intent to monopolize." GELLHORN at 153. Gellhorn and Kovacic state, "[B]y definition, an attempt case involves prosecution of the unsuccessful monopolist, which increases judicial caution." GELLHORN at 154. They add that, as LePage's claims, a defendant can be convicted of both monopolization and an attempt to monopolize, but the more common view is that the attempt merges into the offense of monopolization. See id. at n.15. Similarly, the Areeda treatise adds that despite the rhetoric of some cases, exclusionary conduct by a monopolist within its own market, whether successful or not, is best treated as an aspect of the full monopolization offense. IIIA A REEDA P 806a. The Areeda treatise also states that to say that one who has monopolized also has attempted to monopolize is "redundant and adds nothing to the scope of available remedies." Id. at P806f4. Therefore, the attempt to monopolize should be merged into the completed offense. See id. In Multiflex, Inc. v. Samuel Moore & Co., 709 F.2d 980, 990 (5th Cir. 1983), the court stated that "it is only the failure of the scheme that keeps the [attempted monopolization] charge from becoming actual monopolization."

Indeed, in the case that LePage's cites to support the claim that a party can be held liable for both attempted monopolization and monopolization, American Tobacco Co., 328 U.S. at 783, 66 S.Ct. at 1126, the Court states that the attempted monopolization count was merged into the monopolization claim. See id. In that case, the jury instructions defined "attempt to monopolize" as

> the employment of methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it, which methods, means and practices are so employed by the members of and pursuant to a combination or conspiracy formed for the purpose of such accomplishment.

Id. at 785, 66 S.Ct. at 1127.

31

United States, 342 U.S. 143, 152–53, 72 S.Ct. 181, 186 (1951), the Court stated, "It is consistent with that result to hold here that a single newspaper, already enjoying a substantial monopoly in its area, violates the `attempt to monopolize' clause of S 2 when it uses its monopoly to destroy threatened competition." Id. at 154, 72 S.Ct. at 187. The Court, however, made reference to the publisher's attempt to regain its monopoly by forcing advertisers to boycott a competing radio station and also mentioned the publisher's attempt to regain its pre-1948 substantial monopoly over the mass dissemination of all news and advertising.

Regardless of whether the attempted monopolization claim should merge into the monopolization claim in cases where the defendant has a monopoly, and even if the claim of "attempted maintenance of monopoly" was actually an "attempted monopolization" claim, as LePage's now claims, see Br. of Appellee at 87–90, it still would have to meet the requirements of the latter claim to establish liability. Spectrum Sports clarifies the requirements of an attempted monopolization claim––that the defendant engaged in predatory or anticompetitive conduct with a specific intent to monopolize and a dangerous probability of achieving monopoly power. See Spectrum Sports, 506 U.S. at 454–58, 113 S.Ct. at 890–91. LePage's could not create a separate cause of action under the attempted monopolization offense of section 2 and, by calling it "attempted maintenance of monopoly," avoid the standards of an attempted monopolization claim in an effort to establish liability.

_____

Under those instructions, it seems logical that a company that actually achieved a monopoly could not be found liable for an attempt to monopolize, unless the reasons for the possession of its monopoly were not related to the unlawful conduct that was meant to achieve that monopoly. For example, suppose a company tried through anticompetitive means to achieve a monopoly and came dangerously close to doing so but failed. It nevertheless then obtained a patent and achieved a legal monopoly, following which its competitor filed suit against it for attempted monopolization. In such a circumstance, it would not be illogical to allow an attempt to monopolize claim even though the defendant had achieved an actual monopoly.

32

LePage's has not demonstrated that the facts support a conclusion that 3M engaged in conduct that established each element of an attempted monopolization claim. Although it argues throughout its brief that 3M's actions were predatory and anticompetitive, the attempted monopolization claim has a requirement of specific intent rather than general intent that LePage's did not argue specifically. See Advo, 51 F.3d at 1199. In any event, quite aside from the scope of the LePage's's arguments, in our analysis of the monopolization claim we have come to the conclusion that 3M's rebate program and the other elements of the alleged "monopoly broth" were not predatory and anticompetitive. In the circumstances, inasmuch as LePage's relies on this conduct to establish its attempted maintenance of monopoly claim, its claim must fail. Accordingly, we will affirm the district court's partial grant of the motion for judgment as a matter of law in favor of 3M, although not for the reasons the district court stated in its opinion.

## III. CONCLUSION

For the foregoing reasons, we will affirm the district court's order granting 3M's motion for judgment as a matter of law on the attempted maintenance of monopoly claim and will reverse the district court's order denying its motion for judgment as a matter of law in all other respects. We will remand to the district court to enter judgment for 3M in accordance with this opinion. In view of our result, we do not reach the points 3M has raised in its motion for a new trial.

[This page intentionally left blank]

35

SLOVITER, Circuit Judge, dissenting:

In overturning the jury's verdict for LePage's on its claim that 3M violated S 2 of the Sherman Act and reversing the District Court's denial of 3M's motion for judgment as a matter of law, the majority applies reasoning that would weaken S 2 of the Sherman Act to the point of impotence. While that may be a consummation greatly to be desired by the behemoths of industry, such as Microsoft or 3M, it would be an incalculable loss to business generally and to the consumer. Section 2, the provision of the antitrust laws designed to curb the excesses of monopolists and near-monopolists, is the equivalent in our economic sphere of the guarantees of free and unhampered elections in the political sphere. Just as democracy can thrive only in a free political system unhindered by outside forces, so also can market capitalism survive only if those with market power are kept in check. That is the goal of the antitrust laws. The alternative, government control of markets and regulation of prices, is unacceptable to most of us.

The majority has accomplished its enervation ofS 2 by relying on theories and cases inapplicable here and by failing to consider the synergistic effect of 3M's conduct taken as a whole. In the process, it ignores the jury verdict, the District Court's careful analysis, and this court's directly applicable precedent. It is a development that calls for full en banc review.

I.

INTRODUCTION

It has been well established, as the Supreme Court enunciated thirty-five years ago, that a defendant company who possesses monopoly power in the relevant market will be found in violation of S 2 of the Sherman Act if the defendant wilfully acquired or maintained that power. United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966).

In many S 2 cases, the parties spend much time and effort in seeking to define the market and to determine

36

whether the defendant has monopoly power. Fortunately, in this case we need devote no effort to these issues. It is agreed that the relevant product market is transparent tape, and the relevant geographic market is the United States.[1] Moreover, as to the issue of monopoly power, 3M concedes it possesses monopoly power in the United States transparent tape market, with a ninety percent market share. In fact, the evidence showed that the household penetration of 3M's Scotch-brand tape is virtually one hundred percent.

The sole remaining issue and our focus on this appeal is whether 3M took steps to maintain that power in a manner that violated S 2 of the Sherman Act. A monopolist wilfully acquires or maintains monopoly power when it competes on some basis other than the merits. Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 482-83 (1992); Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 605 n.32 (1985). The District Court, in instructing the jury on Count I, LePage's claim of unlawful maintenance of monopoly power under S 2, explained:

> Count I in this case is unlawful maintenance of monopoly power.
>
> LePage's alleges that it was injured by 3M's unlawful monopolization in the United States market for invisible and transparent tape for home and office use.
>
> To win on their claim of monopolization, LePage's must prove each of the following elements by a preponderance of the evidence.
>
> First, that 3M had monopoly power in the relevant market.
>
> Secondly, that 3M willfully maintained that power through predatory or exclusionary conduct. . . .

_____

1. Although 3M originally challenged LePage's selection of the United States as the relevant geographic market, App. at 7, the District Court held that LePage's had introduced sufficient evidence from which the jury could properly find that the relevant geographic market is the United States and 3M does not challenge that market definition on appeal.

And thirdly, that LePage's was injured in its business or property because of 3M's restrictive or exclusionary conduct.

App. at 5663–64.

The jury was given the following questions on Count I.

(1) Do you find that LePage's has proven, by a preponderance of the evidence, that the relevant market is invisible and transparent tape for home and office use in the United States?

(2) Do you find that LePage's has proven, by a preponderance of the evidence, that 3M unlawfully maintained monopoly power as defined under the instructions for Count I?; [and]

[(3)] Do you find that LePage's has proven, as a matter of fact and with a fair degree of certainty, that 3M's unlawful maintenance of monopoly power injured LePage's business or property as defined in these instructions?

App. at 6523. The jury answered "yes" to each of the three questions. It awarded LePage's more than $22 million before trebling.

Our review of a jury's verdict is limited to determining whether some evidence in the record supports the jury's verdict. Swineford v. Snyder County, 15 F.3d 1258, 1265 (3d Cir. 1994) ("A jury verdict will not be overturned unless the record is critically deficient of that quantum of evidence from which a jury could have rationally reached its verdict."). This is essentially the same inquiry that the District Court made. In considering whether to overturn the jury's verdict, this court must view the evidence in the light most favorable to the verdict winner, here LePage's. Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993). We must accord LePage's "the advantage of every fair and reasonable inference." Id.

LePage's alleges that 3M wilfully maintained its monopoly in the transparent tape market primarily by bundling its rebates and by exclusionary conduct, such as by contracts that expressly or effectively required dealing virtually

exclusively with 3M. 3M does not argue that it did not
engage in this conduct. It agrees that it offered bundled
rebates and entered into some exclusive dealing contracts.
Instead, 3M argues that its conduct was legal as a matter
of law because it never priced its transparent tape above its
cost. For this argument, it relies on the Supreme Court's
decision in Brooke Group Ltd. v. Brown & Williamson
Tobacco Corp., 509 U.S. 209 (1993). The majority in
essence agrees. But Brooke Group did not deal with a
monopolist and the antitrust claim in that case was
predatory pricing, which is not one that LePage's raised
here.

The majority discusses bundled rebates and exclusive
dealing separately. I view that as a serious error. That is
because in determining whether a monopolist competes on
some basis other than the merits, which as noted is the
definition of monopolistic behavior, almost all courts,
including this one, have looked to the monopolist's conduct
taken as a whole rather than considering each aspect in
isolation. See, e.g., Cont'l Ore Co. v. Union Carbide &
Carbon Corp., 370 U.S. 690, 699 (1962) (stating "in a case
like the one before us [alleging S 1 andS 2 violations], the
duty of the jury was to look at the whole picture and not
merely at the individual figures in it") (citation and
quotation omitted); SmithKline Corp. v. Eli Lilly & Co., 575
F.2d 1056, 1061 n.3 (3d Cir. 1978) (determining that
although defendant's anticompetitive scheme "lack[ed] the
element of coercion necessary for liability under the theory
of tie-ins [under S 1]," the evidence of tying was "sufficient
to establish the offense of monopolization underS 2 of the
Sherman Act"); City of Anaheim v. So. Cal. Edison Co., 955
F.2d 1373, 1376 (9th Cir. 1992) ("[I]t would not be proper
to focus on specific individual acts of an accused
monopolist while refusing to consider their overall
combined effect. . . . We are dealing with what has been
called the `synergistic effect' of the mixture of the
elements."); Aspen Highlands Skiing Corp. v. Aspen Skiing
Co., 738 F.2d 1509, 1522 n.18 (10th Cir. 1984) ("Each of
the six [aspects of defendant's exclusionary conduct2]

_____

2. The six aspects referred to by the court were "(1) forcing plaintiff out
of the four-area ticket by requiring that revenues be divided below

39

viewed in isolation need not be supported by sufficient evidence to amount to a S 2 violation. It is enough that taken together they are sufficient to prove the monopolization claim."), aff 'd on other grounds, 472 U.S. 585 (1985); City of Groton v. Conn. Light & Power Co., 662 F.2d 921, 928 (2d Cir. 1981) (" `It is the mix of the various ingredients of utility behavior in a monopoly broth that produces its unsavory flavor.' ") (quoting City of Mishawaka v. Am. Elec. Power Co., Inc., 616 F.2d 976, 986 (7th Cir. 1980)); Northeastern Tel. Co. v. AT&T, 651 F.2d 76, 95 n.28 (2d Cir. 1981) (following Continental Ore to consider defendants' various activities as a whole, although concluding proof of violation "utterly lacking"); cf. United States v. Microsoft, 253 F.3d 34, 78 (D.C. Cir. 2001) (avoiding issue because district court "did not point to any series of acts, each of which harms competition only slightly but the cumulative effect of which is significant enough to form an independent basis for liability"); 2 Philip E. Areeda, Roger D. Blair & Herbert Hovenkamp, Antitrust Law P 310, at 147 (2d ed. 2000) ("In a monopolization case, conduct must always be analyzed `as a whole.' A monopolist bent on preserving its dominant position is likely to engage in repeated and varied exclusionary practices. Each one viewed in isolation might be viewed as de minimis . . . , but the pattern gives increased plausibility to the claim.").

In concluding that there was an insufficient basis to support the jury's verdict, the majority fails to consider whether the synergistic effect of the conduct considered as a whole is anticompetitive. As will be seen, even considered individually the evidence underlying each of LePage's claims supports the jury's verdict. When 3M's conduct is considered as a whole, the conclusion is inescapable that the synergistic effect of 3M's conduct was anticompetitive.

_____

plaintiff 's market share; (2) substituting defendant's three area ticket for
a four area ticket; (3) marketing and advertising its three mountains in a manner designed to convince consumers that Aspen had only three mountains, not mentioning Aspen Highlands; (4) making an agreement with a tour operator to sell defendant's tickets to the exclusion of plaintiffs; (5) refusing to accept plaintiff 's coupons during the 1978-79 season; and (6) raising ticket prices for a single-day lift ticket thus eliminating plaintiff 's ability to offer a multi-area ticket." Id. at 1517.

II.

DISCUSSION

A.

Bundled Rebates

Through a sophisticated program of rebates, denominated Executive Growth Fund and Partnership Growth Fund, 3M induced customers to eliminate or substantially reduce their purchases from LePage's. Rather than relying on volume discounts which often reflect cost savings, 3M offered discounts to customers for purchases spanning six of 3M's diverse product lines. Those covered by the rebate program were: Health Care Products, Home Care Products, Home Improvement Products, Stationery Products (including transparent tape), Retail Auto Products, and Leisure Time. Sealed App. at 2979. Both of 3M's rebate programs set customer-specific target growth rates in each product line. The size of the rebate was linked to the number of product lines in which targets were met, and the number of targets met by the buyer determined the rebate it would receive on all of its purchases.

The rebates were considerable. For example, Kmart received $926,287 in 1997, Sealed App. at 2980, and in 1996 Wal-Mart received more than $1.5 million, Sam's Club received $666,620, and Target received $482,001. Sealed App. at 2773. A failure to meet the target for a single product line would diminish the rebate received across all product lines. Thus, there was a substantial incentive for each customer to meet the targets across all product lines to maximize its rebates.

1. Applicability of SmithKline

In discussing 3M's bundled rebates, the majority recognizes that it must address our decision in SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056 (3d Cir. 1978), where this court held that conduct substantially identical to 3M's was anticompetitive and sustained the finding of a violation of S 2. SmithKline concerned sales to hospitals by Eli Lilly &

41

Company, the pharmaceutical manufacturer, of three of its cephalosporins which it sold under the trade names Kefzol, Keflin and Keflex. Cephalosporins, which are broad spectrum antibiotics, were at that time indispensable to hospital pharmacies. Lilly had a monopoly on both Keflin and Keflex because of its patents. However, those drugs faced competition from the generic drug cefazolin which Lilly sold under the trade name Kefzol and which SmithKline sold under the trade name Ancef.

Lilly's profits on the patented Keflin were far higher than those on Kefzol where its pricing was constrained by the existence of a competitor (SmithKline). Thus, Lilly sought to preserve its market position in Keflin and discourage sales of Ancef and even its own Kefzol. Id. at 1061. To do this, Lilly instituted a rebate program that provided a 3% bonus rebate for hospitals that purchased specified quantities of any three of Lilly's five cephalosporins. SmithKline brought a S 2 monopolization claim, alleging that Lilly used these multi-line volume rebates to maintain its monopoly over the nonprofit hospital market for cephalosporins.

The district court (Judge A. Leon Higginbotham, later a member of this court) found that Lilly's pricing policy violated S 2. SmithKline Corp. v. Eli Lilly & Co., 427 F. Supp. 1089 (E.D. Pa. 1976). We affirmed by a unanimous decision. Although customers were not forced to select which cephalosporins from Lilly's stable they purchased, we recognized that the effect of the rebate program was to induce hospitals to conjoin their purchases of Kefzol with Keflin and Keflex, Lilly's "leading sellers." SmithKline, 575 F.2d at 1061. As we stated, "[a]lthough eligibility for the 3% bonus rebate was based on the purchase of specified quantities of any three of Lilly's cephalosporins, in reality it meant the combined purchases of Kefzol and the leading sellers, Keflin and Keflex." Id. The gravamen of Lilly's S 2 violation was that Lilly linked a product on which it faced competition with products on which it faced no competition. Id. at 1065.

The effect of the 3% bundled rebate was magnified by the volume of Lilly products sold, so that "in order to offer a rebate of the same net dollar amount as Lilly's, SmithKline had to offer purchasers of Ancef rebates of some 16% to

42

hospitals of average size, and 35% to larger volume hospitals." Id. at 1062. Lilly's rebate structure combining Kefzol with Keflin and Keflex "insulat[ed] Kefzol from true price competition with [its competitor] Ancef." Id. at 1065.

LePage's private-label and second-tier tapes are, as Kefzol and Ancef were in relation to Keflin, less expensive but otherwise of similar quality to Scotch-brand tape. Indeed, before 3M instituted its rebate program, LePage's had begun to enjoy a small but rapidly expanding toehold in the transparent tape market. 3M's incentive was thus the same as Lilly's in SmithKline: to preserve the market position of Scotch-brand tape by discouraging widespread acceptance of the cheaper, but substantially similar, tape produced by LePage's.

3M bundled its rebates for Scotch-brand tape with its second-tier and private-label tape in much the same way that Lilly bundled its rebates for Kefzol with Keflin and Keflex. In both cases, the bundled rebates reflected an exploitation of the seller's monopoly power. Just as "[cephalosporins] [were] carried in . .. virtually every general hospital in the country," SmithKline , 575 F.2d at 1062, Scotch-brand tape is indispensable to any retailer in the transparent tape market.

In light of the manifest comparability between the facts in SmithKline and here, this court's analysis of S 2 of the Sherman Act in SmithKline and our conclusion in that case is not only directly relevant but controlling. Speaking through Judge Aldisert, we said:

> With Lilly's cephalosporins subject to no serious price competition from other sellers, with the barriers to entering the market substantial, and with the prospects of new competition extremely uncertain, we are confronted with a factual complex in which Lilly has the awesome power of a monopolist. Although it enjoyed the status of a legal monopolist when it was engaged in the manufacture and sale of its original patented products, that status changed when it instituted its [bundled rebate program]. The goal of that plan was to associate Lilly's legal monopolistic practices with an illegal activity that directly affected

43

> the price, supply, and demand of Kefzol and Ancef.
> Were it not for the [bundled rebate program] the price,
> supply, and demand of Kefzol and Ancef would have
> been determined by the economic laws of a competitive
> market. [Lilly's bundled rebate program] blatantly
> revised those economic laws and made Lilly a
> transgressor under S 2 of the Sherman Act.

Id. at 1065.

The effect of 3M's rebates were even more powerfully
magnified than those in SmithKline because 3M's rebates
required purchases bridging 3M's extensive product lines.
In some cases, these magnified rebates to a particular
customer were as much as half of LePage's entire prior tape
sales to that customer. For example, LePage's sales to
Sam's Club in 1993 totaled $1,078,484, while 3M's 1996
rebate to Sam's was $666,620. Similarly, LePage's 1992
sales to Kmart were $2,482,756; 3M's 1997 rebate to Kmart
was $926,287. 3M used its monopoly in transparent tape,
backed by its considerable catalog of products, to squeeze
out LePage's. 3M's conduct was at least as anticompetitive
as the conduct which this court held violated S 2 in
SmithKline.

The majority makes several efforts to distinguish this
case from SmithKline but they are unpersuasive. In one
attempt, relegated to a footnote, the majority states that
LePage's claim, like that of the plaintiff in SmithKline, is one
of "monopoly leveraging" and as such must fail because a
monopoly leveraging case requires two separate markets
whereas the parties both treat this case as having only one
market for purposes of the appeal. See Maj. Op. at 15 n.5.

This is not a monopoly leveraging case, nor could it be.
As Judge Mansmann explained in Fineman v. Armstrong
World Industries, Inc., 980 F.2d 171 (3d Cir. 1992), a
leveraging claim entails an effort to convert monopoly power
in one market into either a monopoly or a dangerous
probability of monopoly in another market. Id. at 203; see
also 3 Areeda & Hovenkamp, Antitrust LawP 652, at 83
(rev. ed. 1996) (defining monopoly leveraging as a situation
where "the monopolist . . . `misuse[s]' or `abuse[s]' its
monopoly power by `leveraging' it so as to give the

44

monopolist an unfair advantage in the secondary market,
even though (a) the monopolist lacks significant power in
the secondary market; and (b) there is no reasonable
prospect that it will acquire monopoly power there"). The
claim was unsuccessful in Fineman because, although
defendant Armstrong probably could have been viewed as
having dominance in the leveraging market, which was
resilient floor covering, there was no evidence of a use of
that market power to attempt to monopolize the video
magazine market (producing a monthly videotape magazine
for retailers of floor covering products). Significant is the
fact that there were two separate non-competitive markets
at issue--floor coverings and video magazines.

Although there is some passing reference in Fineman
categorizing SmithKline among monopoly leveraging claims,
Fineman, 980 F.2d at 204 ("[a]lthough monopoly leveraging
claims are not entirely foreign to us, see Danny Kresky
Enterprises, Corp. v. Magid, 716 F.2d 206 (3d Cir. 1983),
[and] SmithKline"), there was no further discussion of
SmithKline in that context and no explication. [3]

Advo, Inc. v. Philadelphia Newspapers, Inc., 51 F.3d 1191
(3d Cir. 1995), which the majority cites, is completely
inapplicable here.[4] In that case, the claim was an attempt
to monopolize the market for delivering preprinted
advertising circulars in the greater Philadelphia area, and
plaintiff alleged that the defendant offered predatorily low
prices to major purchasers of delivery services for circular
advertising. It was not a market leveraging case.

SmithKline never argued monopoly leveraging in its case
and it never claimed predatory pricing. Even more
important, LePage's did not claim that this was a monopoly

_____

3. This court held in Fineman that the district court erred in granting a
judgment notwithstanding the verdict but that there was sufficient
evidence of anti-competitive conduct to warrant a new trial for violation
of S 1 of the Sherman Act.

4. The only reference in Advo to SmithKline is the statement that the
quantity discounts offered by the defendant distinguished that case from
SmithKline, "where we found that discounts tied to the purchase of
specific items might amount to unlawful leveraging of monopoly power."
51 F.3d at 1203 (emphasis omitted).

45

leveraging case and, in fact, requested that the court not charge the jury on a monopoly leveraging theory. App. at 5466-67. The court did not so charge. The majority has floated a red herring.

Unlike the monopoly leveraging cases where the harm is the extension of monopoly power from one market to another, here 3M, if successful in eliminating competition from LePage's second-tier or private-label tape, would consolidate its monopoly in the transparent tape market. It would destroy any serious threat to the dominance of the Scotch-brand tape, as foreign competition was not viable and there were no incipient competitors on the horizon. Thus unrestrained, 3M could eliminate or reduce the rebates that it offered to favored customers, which it had introduced only after LePage's entry into the market with its lower priced options. This is not the scenario to which monopoly leveraging cases are directed. It is whatS 2 of the Sherman Act was designed to prevent.

2. Anticompetitive Effect

The importance of the fact that 3M can exercise monopoly power in the transparent tape market cannot be underestimated when considering the anticompetitive effect of its conduct. See, e.g., Robert Pitofsky, New Definitions of Relevant Market and the Assault on Antitrust, 90 Colum. L. Rev. 1805, 1807 (1990) ("In monopoly enforcement under section 2 of the Sherman Act, the pivotal inquiry is almost always whether the challenged party has substantial market power in its relevant market."). Monopoly power is "the power to control prices or exclude competition." SmithKline, 575 F.2d at 1065 (quoting United States v. E.I. Du Pont de Nemours & Co., 351 U.S. 377, 391 (1956)); see also Borough of Lansdale v. Phila. Elec. Co., 692 F.2d 307, 311 (3d Cir. 1982).

The District Court, recognizing that "this case presents a unique bundled rebate program that the jury found had an anti-competitive effect," Le Page's, Inc. v. 3M, No. 97-3983, 2000 WL 280350, at *5 (E.D. Pa. Mar. 14, 2000), denied 3M's motion for judgment as a matter of law (JMOL), stating:

46

Plaintiff introduced evidence that Scotch is a monopoly product, and that 3M's bundled rebate programs caused distributors to displace Le Page's entirely, or in some cases, drastically reduce purchases from Le Page's. Tr. Vol. 30 at 105–106; Vol. 27 at 30. Under 3M's rebate programs, 3M set overall growth targets for unrelated product lines. In the distributors' view, 3M set these targets in a manner which forced the distributor to either drop any non-Scotch products, or lose the maximum rebate. PX 24 at 3M 48136. Thus, in order to qualify for the maximum rebate under the EGF/PGF programs, the record shows that most customers diverted private label business to 3M at 3M's suggestion. Tr. Vol. 28 at 74–75; PX23, 28, 32, 34, 715. Similarly, under the newer Brand Mix rebate program, 3M set higher rebates for tape sales which produced a shift from private label tape to branded tape. Tr. Vol. 31 at 79. PX 393 at 534906.

 Furthermore, Plaintiff introduced evidence of customized rebate programs that similarly caused distributors to forego purchasing from Le Page's if they wished to obtain rebates on 3M's products. Specifically, the trial record establishes that 3M offered Kmart a customized growth rebate and Market Development Funds payment. In order to reach the $15 million sales target and qualify for the $1 million rebate, however, Kmart had to increase its consumer stationary purchases by $5.5 million. Kmart substantially achieved this "growth" by dropping Le Page's and another private label manufacturer, Tesa. PX 51 at 3M 102175, PX 121 at 156838. Likewise, 3M customized a program with Staples that provided for an extra 1% bonus rebate on Scotch tape sales "if Le Page's business is given to 3M." PX 98 at 3M 149794. Finally, 3M provided a similar discount on Scotch tape to Venture Stores "based on the contingency of Venture dropping private label." PX 712 at 3M 450738. Thus, the jury could have reasonably concluded that 3M's customers were forced to forego purchasing Le Page's private label tape in order to obtain the rebates on Scotch tape.

47

Id.

The majority's principal basis for overturning the jury's verdict and the District Court's denial of judgment as a matter of law is its disagreement with the District Court's finding that "[LePage's] introduced substantial evidence that the anti-competitive effects of 3M's rebate programs caused LePage's losses." Id. at *7. Glossing over the substantial evidence of loss and its connection to 3M's conduct, the majority imposes a new requirement on S 2 plaintiffs by holding that LePage's failed to "show that it could not compete by calculating the discount that it would have had to provide in order to match the discounts offered by 3M through its bundled rebates." Maj. Op. at 18. The majority cites no authority for this novel proposition. Moreover, it has no relationship to the record in this case.

The jury was capable of calculating from the evidence the amount of rebate a customer of 3M would lose if it failed to meet 3M's quota of sales in even one of the bundled products. Thus, the majority's requirement to show "the discount that [LePage's] would have had to provide to match the discounts offered by 3M through its bundled rebates" can be measured by the discounts 3M gave or offered. For example, LePage's points out that in 1993 Sam's Club would have stood to lose $264,900, Sealed App. at 1166, and Kmart $450,000 for failure to meet one of 3M's growth targets in a single product line. Sealed App. at 1110.

Moreover, even using the majority's analysis, it is not the amount the customer would have lost had it stayed with LePage's without a comparable discount that is important but the effect of 3M's rebates on LePage's earnings, if LePage's had attempted to match 3M's discounts. That amount would represent the impact of 3M's bundled rebates on LePage's ability to compete, and that is what is relevant under S 2 of the Sherman Act.

The impact of 3M's discounts was apparent from the chart introduced by LePage's that shows that LePage's earnings as a percentage of sales plummeted to below zero --to negative 10%--during 3M's rebate program. See App. at 7037; see also App. at 7044 (documenting LePage's

healthy operating income from 1990 to 1993, rapidly declining operating income from 1993 to 1995, and large operating losses suffered from 1996 through 1999). Demand for LePage's tape, especially its private-label tape, decreased significantly following the introduction of 3M's rebates. Although 3M claims that customers participating in its rebate programs continued to purchase tape from LePage's, the evidence does not support this contention. Most distributors dropped LePage's entirely.

As the District Court found, "[LePage's] introduced evidence . . . that 3M's bundled rebate programs caused distributors to displace Le Page's entirely, or in some cases, drastically reduce purchases from Le Page's." Le Page's, 2000 WL 280350, at *5. For example, LePage's lost key large volume customers, such as Kmart, Staples, American Drugstores, Office Max, and Sam's Club. App. at 943-44, 2416-17. Other large customers, like Wal-Mart, drastically cut back their purchases. App. at 2417. In transparent tape manufacturing, large volume customers are essential to achieving efficiencies of scale. As 3M concedes in its brief, " `large customers were extremely important to [LePage's], to everyone.' . . . Large volumes . . . permitted `long runs' making the manufacturing process more economical and predictable." Br. of Appellant at 10 (quoting trial testimony of Les Baggett, LePage's former president and CEO, App. at 234) (citation omitted). By March of 1997, LePage's was forced to close one of its two plants. App. at 2401. Making all inferences in LePage's favor, the conclusion is unavoidable that LePage's could not effectively compete. LePage's has more than satisfied even the majority's draconian standard.

But perhaps more important, the majority's imposition of a requirement that plaintiffs demonstrate that they could not compete "by calculating the discount [the plaintiff] would have to provide . . . to match the [monopolist's bundled discounts]" is contrary to our precedent and that of the Supreme Court. If this is intended to make a plaintiff 's cost and efficiency the key factors in all S 2 cases, it introduces a novel consideration into an analysis that should be directed to actions taken by a monopolist. In our opinion in SmithKline, we nowhere discussed

SmithKline's costs. The district court in SmithKline acknowledged that SmithKline was less efficient than Lilly, SmithKline, 427 F. Supp. at 1108, but it nonetheless held that SmithKline prevailed on its claim.

Admittedly, LePage's must bear the initial burden of demonstrating that the defendant's conduct "produced adverse, anti-competitive effects within the relevant product and geographic markets." United States v. Brown Univ., 5 F.3d 658, 668 (3d Cir. 1993).5 There is no exclusive way to make that showing. We have stated that "[t]he plaintiff may [show anticompetitive effects] by proving the existence of actual anticompetitive effects, such as reduction of output, . . . increase in price, or deterioration in quality of goods or services." Brown, 5 F.3d at 668 (citations omitted). But, as we observed in Brown, "[s]uch proof is often impossible to make . . . due to the difficulty of isolating the market effects of challenged conduct." Id. (citing 7 Areeda, Antitrust Law P 1503, at 376 (1986)).

We noted, however, that "[m]arket power, the ability to raise prices above those that would prevail in a competitive market . . . is essentially a `surrogate for detrimental effects.' " Id. (quoting FTC v. Ind. Fed'n of Dentists, 476 U.S. 447, 460-61 (1986)). For example, in SmithKline , the district court, in an opinion which this court characterized as, "meticulous and comprehensive," SmithKline, 575 F.2d at 1058 n.1, touched not only on the effect of Lilly's conduct on the plaintiff but equally, if not more importantly, the effect on competition generally. Judge Higginbotham observed, "[a]fter a review of the operation of [Lilly's rebate program] and its impact on SmithKline, and, more importantly, on the nonprofit hospital market for cephalosporins, I find Lilly guilty of the offense of monopolization in violation of section two of the Sherman Act." SmithKline, 427 F. Supp. at 1121 (emphasis added).

_____

5. Although Brown is a S1 rule of reason case, the legal frameworks for analyzing rule of reason violations of S 1 and monopolization claims under S 2 are similar. See, e.g., Microsoft, 253 F.3d at 59; Mid-Texas Communications Sys., Inc. v. AT&T, 615 F.2d 1372, 1389 n. 13 (6th Cir. 1980).

50

Ironically, the majority even quotes the well-accepted proposition that to be anticompetitive, conduct must harm competition itself-- "[h]arm to a competitor will not suffice." Maj. Op. at 23, n.11. Harm to a competitor becomes relevant to damages only after a violation is shown, but the majority disclaims reaching the damages issue. Maj. Op. at 18. Inexplicably the majority fails to consider whether 3M's actions were harmful to competition, a sine qua non for a violation of S 2.

LePage's presented powerful evidence that competition itself was harmed. The District Court recognized this in its opinion, when it said:

> The jury could reasonably infer that 3M's planned elimination of the lower priced private label tape, as well as the lower priced Highland brand, would channel consumer selection to the higher priced Scotch brand and lead to higher profits for 3M. Indeed, Defendant concedes that "3M could later recoup the profits it has forsaken on Scotch tape and private label tape by selling more higher priced Scotch tape . . . if there would be no competition by others in the private label tape segment when 3M abandoned that part of the market to sell only higher-priced Scotch tape."

Le Page's, 2000 WL 280350, at *7.

The plan that the District Court posited, that 3M sought to force LePage's from the market to eliminate the competition from LePage's second-tier tape, so that 3M could decrease its sales of its less profitable second-tier branded tape and force customers back to the higher priced Scotch-brand tape, was not implausible. Prior to the introduction of 3M's rebate program, LePage's share of the transparent tape market had been skyrocketing.  For example, LePage's sales to Staples increased by 440% from 1990 to 1993. App. at 1907-08. Following the introduction of 3M's rebate program which bundled its private-label tape with its other products, 3M's private-label tape sales increased 478% from 1992 to 1997.[6] LePage's in turn lost

_____

6. In 1992 3M's private-label tape sales were $1,142,000. By 1997, its private-label tape sales had increased to $5,464,222. Sealed App. at 489.

51

a proportional amount of sales.[7] As a result, LePage's manufacturing process became less efficient and its profit margins declined. In 1997, the only other domestic transparent tape manufacturer, Tesa Tuck, Inc., bowed out of the transparent tape business entirely. App. at 3008–09. Had 3M continued with its program 3M could have eventually forced LePage's out of the market.

3M could effectuate such a plan because there was no ease of entry. See Advo, 51 F.3d at 1200 (commenting that ease of entry would prevent monopolist's predatory pricing scheme from succeeding); see also Edward A. Snyder & Thomas E. Kauper, Misuses of the Antitrust Laws: The Competitor Plaintiff, 90 Mich. L. Rev. 551 (1991) (finding "barriers to entry" to be one of two necessary conditions for exclusionary conduct, the other being "market power").

The District Court found that there was "substantial evidence at trial that significant entry barriers prevent competitors from entering the . . . tape market in the United States. Thus, this case presents a situation in which a monopolist remains unchecked in the market." Le Page's, 2000 WL 280350, at *7. In the time period at issue here, there has never been a competitor that has genuinely challenged 3M's monopoly and it never lost a significant transparent tape account to a foreign competitor. App. at 4272.

The significance of entry barriers is emphasized in Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039 (8th Cir. 2000), a case cited by the majority. In that case the court reviewed a multimillion dollar jury verdict on behalf of plaintiff boat builders who alleged that the dominant stern drive engine manufacturer violated S 7 of the Clayton Act and SS 1 and 2 of the Sherman Act. The Court of

_____

7. According to the majority, some of these losses were attributable to quality or service issues. Maj. Op. at 26–27. That evidence is in dispute. Given the existence of evidence to the contrary, the majority's reading of the facts is simply not consistent with this court's precedent, which the majority cites with approval, see Maj. Op. at 13, that, when considering whether to overturn the jury's verdict, this court must view the evidence in the light most favorable to the verdict winner. Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993).

Appeals overturned the S 7 verdict as barred by the statute of limitations and the Sherman S 1 verdict because the expert opinion on which it was based was not supported by the facts. It also reversed the Sherman S 2 verdict, but here the opinion shows the difference between the facts in that case and those here. First, the court noted that the boat builders "did not show that significant barriers to entry existed in the stern drive market." Id. at 1059. It commented that "[i]f entry barriers to new firms are not significant, it may be difficult for even a monopoly company to control prices through some type of exclusive dealing arrangement because a new firm or firms easily can enter the market to challenge it." Id. It continued, "[i]f there are significant entry barriers in the market, a potential competitor would have difficulty entering in order to challenge a firm that is charging supracompetitive high prices." Id. In this case, 3M does not dispute that there are significant barriers to entry in the transparent tape market, as the District Court found.

Second, in holding that the plaintiff boat builders had not shown that Brunswick's engine price was below cost, the court relied on the decision in Brooke Group where the Court held that a predatory pricing claim could not be grounded on above-cost discounting. The Concord court distinguished other S 2 cases, including an earlier decision of the District Court in this case, LePage's, Inc. v. 3M, No. 97-3983, 1997 WL 734005 (E.D. Pa. 1997), on the ground that in Brunswick "there are no allegations of tying or bundling with another product." Concord, 207 F.3d at 1062. Of course, the bundled rebates offered by 3M occupy a central place in LePage's case.

Finally, in its decision the Eighth Circuit noted that "Brunswick's discount programs were not exclusive dealing contracts and its customers were not required either to purchase 100% from Brunswick or to refrain from purchasing from competitors in order to receive the discount." Id. at 1062-63. The court noted that its customers could purchase up to forty percent of requirements from other sellers without foregoing the discount. That situation is far different from 3M's bundled rebate programs, as there was ample evidence that its

53

discount was, in effect, available only if the customer bought all of its transparent tape requirements from 3M. In summary, unlike the Brunswick situation, here there were significant barriers to entry, 3M bundled its rebates, and 3M imposed exclusive dealing requirements on some of its principal customers.

As the majority concedes, Maj. Op. at 28, there was evidence from which the jury could have determined that 3M intended to force LePage's from the market, and then cease or severely curtail its own private-label and second-tier tape lines. For example, by 1996, 3M had begun to offer incentives to some customers to increase purchases of its higher priced Scotch-brand tapes over its own second-tier brand. The Supreme Court has made clear that intent is relevant to proving monopolization, see Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 602 (1985), and attempt to monopolize, Lorain Journal Co. v. United States, 342 U.S. 143, 155 (1951).

3M's interest in raising prices is well-documented in the record. LePage's expert testified that the price of Scotch-brand tape has increased since 1994, after 3M instituted its rebate program. App. at 3246-47, 5392-95. In its opinion, the District Court cited the deposition testimony of a 3M employee acknowledging that the payment of the rebates after the end of the year discouraged passing the rebate on to the ultimate customers. App. at 2092. The District Court thus observed, "the record amply reflects that 3M's rebate programs did not benefit the ultimate consumer." Le Page's, 2000 WL 280350, at *7. The record contained sufficient evidence for the jury to conclude the long-term effects of 3M's conduct were anticompetitive.

3. Relevance of Brooke Group

Running throughout the majority's opinion is the theme that because 3M's prices on transparent tape were not below its average variable cost it could not have violated S 2 of the Sherman Act. This is the principal argument made by 3M on appeal. 3M argues that "[a]bove-cost pricing cannot give rise to an antitrust offense as a matter of law, since it is the very conduct that the antitrust laws wish to promote in the interest of making consumers better off." Br.

54

of Appellant at 30. It cites for this proposition the Supreme Court's decision in Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 222 (1993). Every decision on S 2 since 1993 must deal with Brooke Group, but that case does not hold that a claim of monopolizing or attempting to monopolize will be unsuccessful unless plaintiff shows below-cost predatory pricing.

In Brooke Group, Liggett, a cigarette manufacturer responsible for the "innovative development" of generic cigarettes, claimed that Brown & Williamson, which introduced its own line of generic cigarettes, "cut prices on generic cigarettes below cost and offered discriminatory volume rebates to wholesalers to force Liggett to raise its own generic cigarette prices and introduce oligopoly pricing in the economy segment [of the national cigarette market]." Id. at 212. Brown & Williamson's deep price discounts or rebates were concededly discriminatory (Liggett's claim included violation of the Robinson- Patman Act), not cost justified, and resulted in substantial loss to it. The Supreme Court majority held that defendant was entitled to judgment as a matter of law because there was no evidence of injury to competition. The Court also held that the evidence did not show that Brown & Williamson's alleged scheme "was likely to result in oligopolistic price coordination and sustained supracompetitive pricing in the generic segment of the national cigarette market. Without this, Brown & Williamson had no reasonable prospect of recouping its predatory losses and could not inflict the injury to competition the antitrust laws prohibit." Id. at 243.8

The Brooke Group opinion is premised on the national cigarette market at that time, which was composed of six manufacturers whose prices for cigarettes "increased in lockstep" and who "reaped the benefits of prices above a competitive level." Id. at 213. Brown & Williamson's share

_____

8. In contrast, the District Court here noted that 3M had conceded that it "could later recoup the profits it has forsaken on Scotch tape and private-label tape by selling more higher priced Scotch tape . . . if there
would be no competition by others in the private-label tape segment when 3M abandoned that part of the market to sell only higher-priced Scotch tape." Le Page's, 2000 WL 280350, at *7 (omission in original).

of the oligopolistic market was described in the opinion as twelve percent. Thus, its conduct and pricing were at all times constrained by the presence of competitors who could, and did, react to its conduct by undertaking similar price cuts or pricing behavior.9

In contrast, 3M is a monopolist. It is a tenet of antitrust law that a monopolist is not permitted to take certain actions that a company in a competitive (or even oligopolistic market) may take, because there is no constraint on a monopolist's behavior. See, e.g. , Aspen Skiing, 472 U.S. at 601–04. Even if Brooke Group could be read for the proposition that all pricing action is legal if the company's prices are not below its costs, nothing in the Supreme Court's decision suggests that its discussion of the issue is applicable to a monopolist with its unconstrained market power. And nothing in that opinion gives the imprimatur of approval to bundled rebates, the conduct by 3M that the jury found violated S 2.

Even if 3M had not engaged in other exclusionary conduct, the jury's conclusion that 3M unlawfully maintained its monopoly power is amply supported by the evidence of 3M's bundled rebate programs.

B.

Exclusive Dealing

3M did not confine its monopolization actions to its bundled rebate programs. LePage's produced substantial evidence of exclusionary conduct by 3M, much of it designed to achieve sole-source supplier status, either facially or indirectly.10 Even though exclusivity

_____

9. The Brooke Group opinions, both for the majority and the dissent, discuss the responses by members of the oligopoly to the introduction of discounted cigarettes. Id. at 239–40; id. at 247–48 (Stevens, J., dissenting).

10. The jury's finding against LePage's on its exclusive dealing claim under S 1 of the Sherman Act and S 3 of the Clayton Act does not preclude the application of evidence of 3M's exclusive dealing to support

arrangements are often analyzed under S 1, such exclusionary conduct may also be an element in aS 2 claim. U.S. Healthcare, Inc. v. Healthsource, Inc., 986 F.2d 589, 593 (1st Cir. 1993) (observing that exclusivity may also play "a role . . . as an element in attempted or actual monopolization"). When evaluating a plaintiff 's exclusive dealing claim under S 1, this court has looked to the increase in the defendant's market share, the effects of foreclosure on the market, benefits to customers and the defendant, and the extent to which customers felt they were precluded from dealing with other manufacturers. Barr, 978 F.2d at 110-11. There is no reason why these factors would not be equally applicable under S 2.

According to LePage's, 3M's exclusionary "tactics foreclosed the competitive process by preventing rivals from competing to gain (or maintain) a presence in the market." Br. of Appellee at 45-46. The District Court instructed the jury that for purposes of finding a S 2 violation, " `exclusionary' comprehends . . . behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way." App. at 6490. The instruction followed the applicable legal principles enunciated in Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 482-83 (1992). See also Aspen Skiing, 472 U.S. at 605 n.32. In fact, one of the foremost antitrust treatises approvingly cites an unreported opinion by the District Court in this case as an example of how discounts conditioned on exclusivity are "problematic""when the defendant is a dominant firm in a position to force manufacturers to make an all-or-nothing choice." 11 Hovenkamp, Antitrust Law P 1807b, at 117 n.7 (1998) (citing LePage's, 1997 WL 734005 (E.D. Pa. 1997)).

_____

LePage's S 2 claim. See, e.g., Barr Labs. v. Abbott Labs., 978 F.2d 98, 110-11 (3d Cir. 1992) (considering S 2 of the Sherman claims after rejecting claims based on the same evidence underS 1 of the Sherman Act and S 3 of the Clayton Act); SmithKline, 427 F. Supp. at 1092, aff 'd, 575 F.2d 1056 (imposing S 2 Sherman Act liability for exclusionary conduct, after rejecting an exclusive dealing claim under S 3 of the Clayton Act).

In Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320 (1961), which the majority cites and which dealt with S 3 of the Clayton Act, not S 2 of the Sherman Act, the Court took cognizance of arrangements which, albeit not expressly exclusive, effectively foreclosed the business of competitors. It has been noted that even quantity discounts may foreclose a substantial portion of the market. See, e.g., 11 Hovenkamp, Antitrust Law P 1807a, at 115-16. As Professors Areeda and Hovenkamp recognize, "unilaterally imposed quantity discounts can foreclose the opportunities of rivals when a dealer can obtain its best discounts only by dealing exclusively with the dominant firm. This is particularly true when the discounts are cumulative over lengthy periods of time--for example, one year--and where no obvious economies result from giving lower prices in, say, August on the basis of large purchases made in January." 3A Areeda & Hovenkamp, Antitrust Law P 768b3, at 151 (1996).

Because some of 3M's rebates were "all or nothing" discounts, customers maximized their discounts only if they dealt exclusively with the dominant market player, 3M, and they were severely penalized financially for failing to meet their quota in a single product line. Only by dealing exclusively with 3M in as many product lines as possible could customers enjoy the substantial discounts.

The majority acknowledges only two exclusive dealing contracts, those with the Venture and Pomida stores. However, LePage's introduced evidence that the jury could well have believed rendered other arrangements exclusive. Many of LePage's former customers refused to even meet with LePage's sales representatives. App. at 1925, 1451. Of more significance, a buyer of Kmart, LePage's largest customer, which accounted for ten percent of its business, told LePage's "I can't talk to you about tape products for the next three years" and "don't bring me anything 3M makes." App. at 302, 764-65. Kmart switched to 3M following 3M's offer of a $1 million "growth" reward which the jury could have understood to require that 3M be its sole supplier. Similarly, Staples was offered an extra one percent bonus rebate if it gave LePage's business to 3M. The majority accepts 3M's argument that LePage's did not

try hard enough to retain Kmart, its customer for twenty years, but the evidence is to the contrary.11 In any event, this was an issue for the jury which, by its verdict, rejected 3M's argument.

In internal memoranda introduced into evidence by LePage's, 3M executives boasted that the large retailers like Office Max and Staples had no choice but to adhere to 3M's demands. Sealed App. at 2585 ("Either they take the [price] increase . . . or we hold orders . . . ."); see also Sealed App. at 2571 (3M's directive when Staples objected to price increase was "orders will be held if pricing is not up to date on 1/1/98"). Judge Posner, well known for his familiarity with economic doctrine, wrote in a case dealing with exclusive contracts that in order to show that an exclusive-dealing agreement is unreasonable, a plaintiff "must prove that it is likely to keep at least one significant competitor of the defendant from doing business in a relevant market . . . . [and] must prove that the probable (not certain) effect of the exclusion will be to raise prices above (and therefore reduce output below) the competitive level, or otherwise injure competition." Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 394 (7th Cir. 1984).

According to the majority, "there was not enough foreclosure of the market to have an anticompetitive effect," because "LePage's total drop in market share was only 21%." Maj. Op. at 26.12 The majority summarily concludes, "[I]n view of LePage's two thirds share of the private label

_____

11. At trial, LePage's presented the testimony of James Kowieski, its former senior vice president of sales, who described LePage's efforts following Kmart's rejection of its bid. LePage's made a desperate second sales presentation attended by its president, App. at 957 ("I felt that it was very critical to our company's success or failure, so I insured that Mr. Les Baggett, our president, attended the meeting with me."), where LePage's vainly offered additional price concessions, App. at 959 ("We went through the cost savings, the benefits, and we came up with some, again, price concessions, and some programs of a special buy once a year, because, I mean, as far as we were concerned, we were on our last leg.").

12. In fact, LePage's market share dropped 35% from 1992 to 1997. In 1992, LePage's net sales constituted 14.44% of the total transparent tape market. By 1997, LePage's sales has fallen to 9.35%. Sealed App. at 489.

business, its attack on exclusivity agreements seems rather attenuated." Id. at 26.

The first problem with this conclusion is that the "market" share to which the majority refers is LePage's market share in private-label tape. Maj. Op. at 26. But the agreed upon relevant market is for transparent tape in the United States. In that market, where 3M is a monopolist enjoying better than a ninety percent share, LePage's had a much smaller share -- approximately nine percent by 1997. In that market, LePage's claim of exclusion does not at all appear "rather attenuated."

Furthermore, the majority's conclusion is inconsistent with both this court's decision in Barr and the Supreme Court's decision in Tampa Electric, on which both Barr and the majority rely. In Barr, we observed "the degree of market foreclosure is only one of the factors in determining the legality of an exclusive dealing arrangement." Barr, 978 F.3d at 111. The Barr court looked for the additional factors in the qualitative substantiality test enunciated by the Supreme Court in Tampa Electric. The majority entirely omits analysis of the qualitative substantiality test. According to that test,

> [I]t is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein.

Tampa Elec., 365 U.S. at 329; see also Barr, 978 F.2d at 111 (quoting same). Had the majority applied this test, it would have been far more difficult for it to conclude 3M's conduct was not anticompetitive.

Finally, the majority approvingly quotes the statement in the Microsoft opinion of the Court of Appeals for the District of Columbia that "[b]ecause an exclusive deal affecting a small fraction of a market clearly cannot have the requisite harmful effect upon competition, the requirement of a significant degree of foreclosure serves a useful screening

60

function." Maj. Op. at 26 (quoting United States v. Microsoft Corp., 253 F.3d 34, 69 (D.C. Cir. 2001)). However, in the Microsoft opinion, the court had concluded that Microsoft, a monopolist in the operating system market, also foreclosed rivals in the browser market from a "substantial percentage of the available opportunities for browser distribution," through the use of exclusive contracts with key distributors. Microsoft, 253 F.3d at 70. Microsoft kept usage of its competitor's browser below "the critical level necessary for [its rival] . . . to pose a real threat to [Microsoft's] monopoly." Id. at 71. The Microsoft opinion does not specify what percentage of the browser market Microsoft locked up -- merely that, in one of the two primary distribution channels for browsers, Microsoft had exclusive arrangements with most of the top distributors. Id. at 70-71. Significantly, the Microsoft court observed that Microsoft's exclusionary conduct violated S 2 "even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a S 1 violation," id. at 70, a point the majority appears to have overlooked.

The Microsoft court properly treated exclusionary conduct by a monopolist as more likely to be anticompetitive than ordinary S 1 exclusionary conduct. The key exclusionary conduct inquiry in Microsoft was whether the monopolist's conduct excludes a competitor entirely from essential facilities13 which would permit it to achieve the efficiencies

_____

13. This is a version of the bottleneck, or essential facilities problem, applied in the monopoly context. In one of the two distribution channels available for browsers, Microsoft had locked up almost all the high volume distributors. Id. In the seminal Terminal Railroad case, an association of railroad operators locked up the cheapest route across the Mississippi river, the sole railroad bridge crossing at St. Louis. United States v. Terminal R.R. Ass'n, 224 U.S. 383 (1912). The Supreme Court determined that the defendant's agreement to provide access to the bridge to other railroads on discriminatory terms violated S 1 of the Sherman Act.

In the transparent tape market, superstores like Kmart and Wal-Mart provide a crucial facility to any manufacturer--they supply high volume sales with the concomitant substantially reduced distribution costs. By wielding its monopoly power in transparent tape and its vast array of product lines, 3M foreclosed LePage's from that critical bridge to consumers which superstores provide, namely, cheap, high volume supply lines.

of scale necessary to threaten the monopoly. Id. at 70-71; see, e.g., Thomas Krattenmaker & Steven Salop, Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power Over Price, 96 Yale L.J. 209, 214 (1986) ("First one should ask whether the conduct of the challenged firm unavoidably and significantly increases the costs of its competitors. If so, one should then ask whether raising rivals' costs enables the excluding firm to exercise monopoly power."); see also Aspen Skiing, 472 U.S. at 604-05 & n.31 (observing exclusionary conduct is anticompetitive when it disrupts distribution patterns, rendering competitors less efficient). In Microsoft, it was enough that Microsoft had foreclosed enough distribution links to undermine the survival of Netscape as a viable competitor. As discussed above, 3M's exclusionary conduct cut LePage's off from key retail pipelines necessary to permit it to compete profitably. This left 3M free to exercise its monopoly power unchallenged.

As I noted at the outset, the effect of 3M's conduct in strengthening its monopoly position by destroying competition by LePage's in second-tier tape is most apparent when 3M's various activities are considered as a whole. For example, 3M's bundling of its products via its rebate programs reinforced the exclusionary effect of those programs. Together with 3M's conduct designed to achieve actual or virtual sole supplier status the conduct met the criteria for a S 2 violation. There is significant evidence to support the jury's verdict to that effect.

C.

Business Reasons Justification

The majority seeks to excuse 3M's exclusionary conduct on the ground that it acted in furtherance of its economic interests. However, the fact that the Court looked at whether defendant's actions were carried out for"valid business reasons" in Eastman Kodak, 504 U.S. at 483, does not mean that whatever is good for 3M is permissible under S 2 of the Sherman Act. As one Court of Appeals has explained:

62

> In general, a business justification is valid if it relates directly or indirectly to the enhancement of consumer welfare. Thus, pursuit of efficiency and quality control might be legitimate competitive reasons . . . , while the desire to maintain a monopoly market share, or thwart the entry of competitors would not.

Data Gen. Corp. v. Grumman Sys. Support Corp. , 36 F.3d 1147, 1183 (1st Cir. 1994) (citing Eastman Kodak , 504 U.S. at 483; Aspen Skiing, 472 U.S. at 608–11).

The majority states that "[u]nlike the situation of the defendant in Aspen, 3M's pricing structure and bundled rebates were not necessarily contrary to its economic interests, as they likely increased its sales. " Maj. Op. at 24 (emphasis added). Of course a monopolist seeks to further its economic interests, and may do so by increasing its sales. It is not surprising that a monopolist's sales, as measured by market share, may increase when it engages in exclusionary conduct. Thus, for example, exclusionary practice has been defined as "a method by which a firm . . . trades a part of its monopoly profits, at least temporarily, for a larger market share, by making it unprofitable for other sellers to compete with it." Richard A. Posner, Antitrust Law 28 (1976). Once a monopolist achieves its goal by excluding potential competitors, it can then increase the price of its product to the point at which it will maximize its profit. This price is invariably higher than the price determined in a competitive market. That is one of the principal reasons why monopolization violates the antitrust laws. The fact that 3M acted to benefit its own economic interests is hardly a reason to overturn the jury's finding that it violated S 2 of the Sherman Act.

The defendant bears the burden of "persuad[ing] the jury that its conduct was justified by any normal business purpose." Aspen, 472 U.S. at 608. The majority hypothesizes what it terms "several other potential `procompetitive' or valid business reasons for 3M's . . . bundled rebates." Maj. Op. at 24 (emphasis added). It refers to the "efficiency in having single invoices, single shipments and uniform pricing programs for various products." Id. The majority cites to no testimony or evidence in the fifty-five volume appendix that would support these "efficiencies,"

63

even though some customers may have found consolidated billing desirable. It is highly unlikely that transparent tape was shipped along with retail auto products or home improvement products to customers such as Staples or that, if it were, the savings stemming from the joint shipment approaches the multi-million dollars 3M returned to customers in bundled rebates.

There is considerable evidence in the record that 3M entered the private-label market only to "kill it." See, e.g., Sealed App. at 809 (statement by 3M executive in internal memorandum that "I don't want private label 3M products to be successful in the office supply business, its distribution or our consumers/end users"). The majority concedes that the record supports a finding that 3M "was attempting to eliminate the private label category of transparent tape" and that "in view of 3M's dominance in brand tape, . . . it was rational for it to want the sale of tape to be concentrated in that category of the market." Maj. Op. at 28.

That is precisely what S 2 of the Sherman Act outlaws by covering conduct that maintains a monopoly. Maintaining a monopoly is not the type of valid business reason that will excuse exclusionary conduct. The majority usurps the jury's province to decide the facts, despite sufficient evidence to support the jury's verdict.

3M used its market power over transparent tape, backed by its considerable catalog of products, to entrench its monopoly, to the detriment of LePage's, its only serious competitor. The jury's verdict reflects its view that 3M's bundled rebate programs and other exclusionary conduct made it difficult for LePage's to compete on the merits--that is to say, on price, quality, or customer service.

III.

ATTEMPTED MONOPOLIZATION

The jury returned a verdict for LePage's against 3M on LePage's claim that 3M illegally attempted to maintain its monopoly. The District Court overturned the jury's

64

attempted monopolization verdict on the ground that"an attempted maintenance of monopoly power" is "inherently illogical." Le Page's Inc. v. 3M, No. 97-3783, 2000 WL 280350, at *2. The District Court reasoned that:

> [a]ny "attempt claim" rests on the underlying theory that the defendant has failed to achieve its goal, which in this case is maintenance of monopoly power. But, if the defendant has failed to achieve its goal of maintaining monopoly power, then it follows that the defendant lacks monopoly power. Lacking any monopoly power to maintain, the defendant cannot be held liable for "attempted maintenance of monopoly power."

Id. The majority holds that the District Court's reasoning was erroneous but nonetheless affirms.

I agree that the District Court erred in this respect. Courts and commentators have repeatedly found that defendants can be guilty of both monopolization and attempted monopolization claims arising out of the same conduct. See, e.g., Am. Tobacco Co. v. United States, 328 U.S. 781, 783 (1946) (affirming judgment that defendants were guilty of monopolization and attempted monopolization); Earl Kintner, 2 Federal Antitrust Law S 13.1 n.5 (1980). 3M does not dispute this point.

The elements of a S 2 attempted monopolization claim are: (1) predatory or anticompetitive conduct; (2) specific intent to monopolize; and (3) dangerous probability of achieving monopoly power. See Ideal Dairy Farms, Inc. v. John Labatt, Ltd., 90 F.3d 737, 750 (3d Cir. 1996). The law is clear that a defendant possessing monopoly power can be found liable under S 2 for attempted monopolization where that defendant either has failed in its attempt to maintain its monopoly or has not yet succeeded in its attempt to maintain its monopoly. As I have discussed above, 3M (1) engaged in anticompetitive conduct, (2) specifically intended to monopolize and (3) had a dangerous likelihood of success.

The analysis by the Supreme Court of the S 2 attempted monopolization claim in Lorain Journal Co. v. United States, 342 U.S. 143 (1951), is precisely applicable here. In that

65

case, the defendant newspaper had monopoly power and sought to use exclusive dealing contracts with advertiser-customers to destroy its budding rival, a local radio station. Although the defendant had not actually accomplished its objective, the Court held that "a single newspaper, already enjoying a substantial monopoly in its area, violates the `attempt to monopolize' clause of S 2 when it uses its monopoly to destroy threatened competition." Id. at 154.

Similar analysis was applied in the Fifth Circuit decision in Multiflex, Inc. v. Samuel Moore & Co., 709 F.2d 980 (5th Cir. 1983), where the court characterized plaintiff 's S 2 claim as charging defendant with "an unsuccessful attempt to maintain monopoly power through anticompetitive acts." Id. at 991. The court held that "[s]uch a claim could constitute the offense of actual monopolization under section 2 [but that] [i]t fails as actual monopolization only because [defendant's] efforts were unsuccessful." Id. LePage's has charged defendant 3M with the same conduct, i.e. "attempted maintenance of monopoly power." The majority's efforts to distinguish these cases are unpersuasive.

There appears to be some division in the courts as to whether an attempted monopolization claim merges into a monopolization claim when the defendant has been successful. The distinction is merely a semantic one. The key issue is whether a company with market power has taken steps, whether successful or unsuccessful, to destroy incipient competition. If it has, it violated S 2. That a competitor need not demonstrate actual effect on itself, but only show the danger of that effect, is seminal to S 2 jurisprudence. As the Supreme Court observed over half a century ago, "[i]t is . . . unreasonable, per se, to foreclose competitors from any substantial market. . . . The antitrust laws are as much violated by the prevention of competition as by its destruction. . . . It follows a fortiori that the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful." United States v. Griffith, 334 U.S. 100, 107 (1948) (quotations and citations omitted).

I understand the majority's rejection of LePage's attempted monopolization claim to follow its rejection of

66

LePage's monopolization claim because the majority concludes that the rebates and exclusive dealing contracts were not predatory and anticompetitive. Because I disagree with the majority on this central issue, I also disagree with its disposition of LePage's attempted monopolization claim.

IV.

CONCLUSION

The majority fails to look to 3M's conduct as a whole, imposes hurdles for plaintiffs in antitrust actions to the detriment of consumers and competition generally, and fails to acknowledge that sufficient evidence underlies the jury's verdict based on 3M's conduct. I would reinstate the jury's verdict on both LePage's monopolization and attempted monopolization claims.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

67